710 A.2d 31

**COMMONWEALTH of Pennsylvania, Appellee,**

**v.**

**Ronald CLARK, Appellant.**

Supreme Court of Pennsylvania.

Argued Jan. 27, 1997.

Decided April 2, 1998.

Reargument Denied May 15, 1998.

Susan V. Kahn, Pittsburgh, for R. Clark.

Catherine Marshall, Karen A. Brancheau, Philadelphia, for the Com.

Robert A. Graci, Harrisburg, for Office of the Atty. Gen.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO and NEWMAN, JJ.

### OPINION OF THE COURT

CAPPY, Justice.

This case comes before the Court as a direct appeal following the imposition of a sentence of death.[1] On December 2, 1994, a jury found appellant guilty of first degree murder,[2] criminal conspiracy,[3] and possession of an instrument of

1. 42 Pa.C.S. § 9711(h)(1).

2. 18 Pa.C.S. § 2502(a)

3. 18 Pa.C.S. § 903.

crime.[4] Subsequently, the jury considered the evidence presented at the penalty phase hearing and imposed a sentence of death. The jury found one aggravating circumstance, that the defendant had a significant history of felony convictions involving the use of threat of violence to the person,[5] and no mitigating circumstances.[6]

▮ In all cases where the sentence of death has been imposed this court will conduct an independent review of the sufficiency of the evidence supporting the verdict of guilt on the charge of first degree murder even where the defendant does not challenge the verdict. *Commonwealth v. Paolello*, 542 Pa. 47, 665 A.2d 439 (1995). As in all cases where an appellate court reviews the sufficiency of the evidence, the test to be applied is whether, viewing all the evidence in the light most favorable to the verdict winner, there is sufficient evidence to enable the trier of fact to find every element of the crime of first degree murder beyond a reasonable doubt. *Commonwealth v. Jasper*, 531 Pa. 1, 610 A.2d 949 (1992). In order to prove murder of the first degree the evidence must show that a human being was unlawfully killed, that the accused committed the killing, and that the killing was done in an intentional, deliberate and premeditated manner. *Commonwealth v. Mitchell*, 528 Pa. 546, 599 A.2d 624 (1991). The element which distinguishes first degree murder from all other degrees of criminal homicide is the presence of a willful, premeditated and deliberate intent to kill. Specific intent to kill may be inferred from the use of a deadly weapon upon a vital part of the victim's body. *Commonwealth v. Jones*, 530 Pa. 591, 610 A.2d 931 (1992).

At approximately 9:30 p.m. on the evening of October 7, 1993 Aineis Sunn Life and his friend, Kevin Pettiway, were ordering food at the Wayne Junction Deli at 4500 North 20th Street in Philadelphia. While standing in the order line Mr.

4. 18 Pa.C.S. § 907.

5. 42 Pa.C.S. § 9711(d)(9).

6. The defendant had presented evidence of mitigation under 42 Pa.C.S. § 9711(e)(8): Any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense.

Sunn Life asked appellant, who was standing behind him to "back up off me." Appellant replied "Oh, it's like that," and left the Deli. According to the record there was no previous relationship between Mr. Sunn Life and appellant. Kevin Pettiway heard the exchange between Mr. Sunn Life and appellant.

Appellant was observed by Nigel Bell, a man who lived in the vicinity and happened to be a close friend of Mr. Sunn Life, as he exited the Deli. Mr. Bell watched appellant walk away from the Deli to a playground where he spoke with the co-defendant, Kevin Dwight.[7] Mr. Bell knew Mr. Dwight and also knew from prior observations that Mr. Dwight always carried a shotgun inside an umbrella. Mr. Bell saw appellant whisper into Mr. Dwight's ear, and then observed Mr. Dwight hand appellant the umbrella containing the shotgun. Appellant returned to the Deli at a fast pace.

Sherry Taggart, who was employed to sweep the parking lot of the Deli, observed appellant enter the Deli with the umbrella. Ms. Taggart clearly recalled her observation of appellant as it was not raining, thus, she found it strange that he was carrying an umbrella. Mr. Pettiway was standing next to Mr. Sunn Life when appellant re-entered the Deli. Mr. Sunn Life was standing at the cash register when appellant held the shotgun to the back of his head and asked Mr. Sunn Life "What you got to say now m_____ ?" Appellant pulled the trigger and Mr. Sunn Life was declared dead at the scene, the result of a massive shotgun blast to the side of his head.

Mr. Bell after observing appellant's encounter with Mr. Dwight in the playground, and hearing the shotgun blast, immediately entered the Deli. It was at that point Mr. Bell realized his friend had been shot. Mr. Bell took Mr. Sunn Life's chain from his neck, to return it to his family, before the police arrived. Mr. Bell exited the Deli and confronted Mr. Dwight about the shooting. Mr. Dwight told Mr. Bell, "Don't worry I'll take care of it." The next day a woman Mr. Bell knew as an associate of Mr. Dwight, brought a shotgun to Mr.

---

7. Mr. Dwight was convicted of murder in the third degree, criminal conspiracy and possession of an instrument of crime.

Bell's home. The ballistics expert testified that a shotgun shell recovered from the scene had been fired from the shotgun delivered to Mr. Bell's home the day after the shooting.

Given the circumstances of the crime, the use of a deadly weapon on a vital part of the body, and the positive identification of appellant as the person who entered the Deli carrying the shotgun, the evidence was sufficient to establish appellant's guilt of the crime of murder in the first degree. We now turn to the issues raised by appellant in this appeal.

As appellant raises each allegation in the form of ineffective assistance of trial counsel we will first set forth the standard by which this Court reviews such claims of error. Counsel's stewardship is presumed effective. *Commonwealth v. McNeil,* 506 Pa. 607, 487 A.2d 802 (1985). In order to prevail on a claim of ineffectiveness of counsel appellant must show that counsel's conduct, by action or omission, was of questionable legal soundness; that the conduct complained of had no reasonable basis designed to effectuate the client's interest; and that counsel's conduct had an adverse effect on the outcome of the proceedings. *Commonwealth v. Jermyn,* 533 Pa. 194, 620 A.2d 1128 (1993).

Appellant's first claim of error relates to the answer provided by the trial court in response to a question of the jury during penalty phase deliberations. The jury inquired as to the meaning of "life imprisonment." The trial court responded to this question as follows:

All right. I'm going to give you as complete a statement as possible, a truthful situation as to what life imprisonment means in Pennsylvania. Life imprisonment, generally speaking, whether imposed by a jury, does not cover any possibility or does not include any possibility of parole. That's the general proposition. That means life without parole.

But there are two things I want to mention to you in that regard. First, the Parole Board at any time can recommend to the Governor to commute the life sentence. That

means commutation of sentence. And if the Governor grants the commutation of sentence, then the Parole Board may grant parole. So there can be a parole under those circumstances.

What percentage of life imprisonment sentences result in commutation of sentence and parole, I can't give you. I don't have accurate statistics which I can take judicial notice on. That possibility exists.

Now, the second thing I want to say with regard to this: I'm giving you the law as it exists this afternoon. What the law will be tomorrow and next week and what it will be next month no one can predict. The State legislature can redefine any of those things at any time, so keep those two factors in mind.

(Notes of testimony, December 5, 1994, pp. 140–41.). Appellant argues that this response by the trial court impermissibly permitted the jury to consider the possibility of commutation and parole; that the response was inaccurate; and that trial counsel was ineffective for failing to object to the content of the response.

Appellant relies upon the decision of this court in *Commonwealth v. Mills*, 350 Pa. 478, 39 A.2d 572 (1944) to assert that the trial court's response herein was per se impermissible. In *Mills*, this court held that any reference to the possibility of parole was an improper consideration for the jury in their deliberation of the defendant's guilt. The rule announced in *Mills* was consistently followed by the courts in Pennsylvania until the decision of the United States Supreme Court in *Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994).

The prosecutor in *Simmons* argued for the death penalty by stressing the future dangerousness of the defendant, while fully aware that the defendant would not be eligible for parole under state law. The United States Supreme Court found this failure to present the truth to the jury to violate the defendant's due process, and held as follows:

The state may not create a false dilemma by advancing generalized arguments regarding the defendant's future dangerousness while, at the same time, preventing the jury from learning that the defendant never will be released on parole.

*Simmons* at 171, 114 S.Ct. at 2198, 129 L.Ed 2d at 147. In *Commonwealth v. Christy*, 540 Pa. 192, 656 A.2d 877 (1995), this court acknowledged the applicability of *Simmons* to cases in Pennsylvania decided subsequent to *Simmons*, where the issue of the defendant's future dangerousness was raised.[8] Thus, the per se rule of *Mills* upon which appellant relies has been superseded.

 Our analysis does not end here however, because *Simmons* was specifically limited to situations where the defendant's future dangerousness is at issue during the penalty phase of the trial. In the instant case it was not the prosecution who argued future dangerousness, rather it was the appellant who argued the opposite to the jury:

MR. LORUSSO: [counsel for appellant] A governor could at some point in Ronald Clark's life decide that his life sentence should be commuted and he should be released. We've heard about that situation in the news with the last elections. How many times in life do you think in common sense does that happen in Pennsylvania? How many times in the future do you think it will happen after Mark Singel's commuted individual was arrested in New York State for murder? I suggest to you that although commuted life sentences in Pennsylvania is a possibility, it's so remote that it doesn't justify or warrant any consideration in determining what an appropriate sentence in this case should be.

(Notes of Testimony, December 5, 1994 p. 112). Viewing the jury question, what is life imprisonment?, and the trial court's response thereto, against the backdrop of this argument made by appellant's counsel, we would be hard pressed to find error. As the Court in *Simmons* recognized there is an inherent dilemma in permitting one side to argue a position to the jury

8. *Simmons* was decided in June of 1994 and is applicable to the instant case as appellant's trial commenced November 22, 1994.

about the defendant's future in a vacuum. Thus, we find that due process requires the court to instruct the jury on the law as it relates to the possibility of parole where that issue clearly arises from the arguments of either counsel in the penalty phase. *See, Commonwealth v. Chambers,* 546 Pa. 370, 391, 685 A.2d 96, 106 (1996). As we find that in these circumstances, the trial court did not err in its instructions to the jury in response to the question what is life imprisonment, we do not find that trial counsel was ineffective in failing to object to the instruction.[9]

Appellant raises a second objection to the trial court's response to the query: what is life imprisonment, claiming it misled the jury as to who bore the ultimate responsibility in imposing the death sentence; appellant also alleges that trial counsel was ineffective for failing to preserve this specific objection. Appellant focuses on the following passage:

Now, the second thing I want to say with regard to this: I'm giving you the law as it exists this afternoon. What the law will be tomorrow and next week and what it will be next month no one can predict. The State legislature can redefine any of those things at any time, so keep those two factors in mind.

(Notes of testimony, December 5, 1994, pp. 140–41.). From this paragraph appellant mounts an argument that the jury was led to believe that their responsibility for imposing the sentence in this case was not absolute as it could be overturned on appeal. Appellant relies upon *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), and the cases in Pennsylvania following therefrom: *Commonwealth v. Beasley,* 524 Pa. 34, 568 A.2d 1235 (1990); *Commonwealth v. Abu–Jamal,* 521 Pa. 188, 555 A.2d 846 (1989), *cert. denied,* 498 U.S. 881, 111 S.Ct. 215, 112 L.Ed.2d 175 (1990); and, *Commonwealth v. Baker,* 511 Pa. 1, 511 A.2d 777 (1986).

9. Appellant also asserts that the trial court's instruction was incorrect as the trial court referred to the Parole Board rather that the Board of Pardons which is the proper body entrusted with reviewing the Governor's recommendations for commutation. This argument is irrelevant as the jury question was directed at the process of commutation and parole not the nomenclature.

In *Caldwell,* the United States Supreme Court held that where the prosecutor in his closing argument suggested to the jury that the ultimate responsibility for setting the sentence of death rests not with the jury, but with the appellate courts, the jury's subsequent verdict must be set aside as unreliable. In *Baker,* this court applied the holding of *Caldwell* and set aside a verdict of death where the prosecutor told the jury that their verdict would be subject to "appeal after appeal after appeal." *Id.,* 511 Pa. at 20, 511 A.2d at 787. However, in *Beasley,* the court held that merely informing the jury that its decision will be appealed does not minimize the jury's responsibility for the verdict where they are also informed that their decision actually fixes the penalty at death or life imprisonment. In *Abu–Jamal,* this court held that reference to the appellate process by the prosecutor in his closing argument is not sufficient in and of itself to undermine the verdict; this court will look closely to the context in which the comments are made to determine what if any effect they had upon the deliberative process. *Id.,* 521 Pa. at 206, 555 A.2d at 855.

In looking at appellant's allegation of error in light of the above referenced cases, we note first, the reference under inspection was made by the trial court in response to a question by the jury, not in an impassioned plea for the death sentence by the prosecutor. Second, the words were spoken in relation to an explanation of parole as it relates to life imprisonment. Third, the statement by the trial court did not imply that the jury verdict would not be final as it was subject to appeal, rather, the statement explained that the legislature has the power to modify the law governing parole of persons sentenced to life imprisonment. The trial court's statement is thus a reflection of a given fact of a democratic society: the law is always subject to change by the will of the people. Clearly the fears of an unreliable verdict, arrived at by a jury free to indulge any bias that may persuade them to impose a death sentence where they feel no responsibility for its ultimate imposition, which compelled the decision in *Caldwell,* are not present in the instant case. The trial judges's words were

spoken in an effort to thoroughly and truthfully answer the query: "what is life imprisonment." In the context in which the information was relayed, it could only reasonably be interpreted as an admission by the trial court that the availability of parole for a person sentenced to life imprisonment is a decision subject to change by the State Legislature. That statement could not possibly be interpreted by the jury to minimize their role in fixing the punishment for appellant at life imprisonment or death. As we find no error in the trial court's statement we find no ineffectiveness of trial counsel for failing to object to same.

Appellant next argues that it was error to permit the Commonwealth to bolster its evidence in support of the aggravating circumstance, significant history of felony convictions involving the use of threat of violence to the person, with evidence of two misdemeanor convictions of appellant; and that trial counsel was ineffective for failing to raise this objection.

Appellant had two prior convictions for robbery. Each of the robberies was committed with a firearm. In presenting the evidence of the prior convictions the Commonwealth called the custodian of records who recited the entries on the bills of information regarding the prior convictions. In reciting this information the custodian of records read to the jury the entry of pleas by appellant to two separate indictments, each one for robbery and possessing an instrument of crime. Subsequent to hearing this testimony the jury was instructed on the sole aggravating circumstance, wherein the trial court stated:

> Now, the Prosecution has given you evidence that the Defendant had pled guilty, and, therefore, stood convicted of several offenses or penalties in 1983, two robbery cases and *some related weapons offenses.*

(Notes of testimony, December 5, 1994, p. 126). From the combination of these references, appellant argues that the Commonwealth was able to bolster its "flimsy" history of felony convictions with the added misdemeanors, which should not have been presented to the jury.

Appellant's argument is without merit. In *Commonwealth v. Thomas,* 522 Pa. 256, 561 A.2d 699 (1989), this court held that in certain circumstances where the prior misdemeanor and felony offenses arise from the same transaction, the mention of the misdemeanor offense in setting forth the circumstances of the felony, would not be improper. In *Thomas,* the defendant was convicted of a heinous murder committed in the course of burglarizing the victim's apartment. During the course of the attack the victim was sodomized and raped. At sentencing phase the Commonwealth presented the defendant's prior conviction for felonious aggravated assault and indecent assault perpetrated on a three year old boy. This court found no error in allowing the jury to be informed of the misdemeanor indecent assault as it occurred in the same transaction as the aggravated assault, and because it was relevant to the jury's contemplation of the circumstances of the prior felony conviction. *Id.,* 522 Pa. at 276, 561 A.2d at 708.

In the instant case appellant had committed two armed robberies. The fact that the crimes had been committed with use of a firearm was certainly relevant to the Commonwealth's assertion that the prior convictions involved the threat of violence. Nor can we find error in the trial court's reference to the "weapons charges" in its instructions to the jury. The trial court was merely reminding the jury of the evidence presented as to the aggravating circumstance. The trial court went on to inform the jury that it was their function to determine if these prior convictions were in fact significant. As it was not improper for the Commonwealth to present the evidence of the prior misdemeanor convictions, given that they arose from the same transaction as the felony charges, it was not error for trial counsel to fail to object.

Appellant next argues that in the prosecutor's closing argument, at penalty phase, an impermissible comment on appellant's Fifth Amendment right against self-incrimination was made by reference to appellant's failure to show remorse; and that trial counsel was ineffective in failing to object to this

comment. Appellant here relies upon the decision in *Lesko v. Lehman*, 925 F.2d 1527 (3d Cir.1991).

The Third Circuit Court of Appeals granted Lesko a new sentencing hearing on his habeas corpus petition upon finding that the prosecutor had violated Lesko's Fifth Amendment privilege against self-incrimination. In its ruling the court focused on the following comments made by the prosecutor in the closing argument at penalty phase:

> "John Lesko took the witness stand, and you've got to consider his arrogance. He told you how rough it was, how he lived in hell, and he didn't even have the common decency to say I'm sorry for what I did. I don't want you to put me to death, but I'm not even going to say that I'm sorry."

*Id.* at 1539 *quoting* Tr. at 1697. These comments referred to Lesko's testimony at penalty phase; Lesko had not testified at the guilt phase of trial.[10] The court reviewed these comments and found "the prosecutor's criticisms of Lesko's failure to express remorse penalized the assertion of his fifth amendment privilege against self-incrimination, in violation of the rule in *Griffin v. California*." *Id.* at 1544.

The specific rule of *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), is that the protection against self-incrimination embodied in the Fifth Amendment of the United States Constitution is applicable to the states through the Fourteenth Amendment. The *Griffin* Court found a provision of the California Constitution that specifically authorized the jury to consider in determining whether a defendant was guilty of the crime charged the failure of the defendant to testify in that criminal proceeding, as incompatible with the protection of the Fifth Amendment. Thus, the United States Supreme Court held that it was improper for a prosecutor to comment to the jury on a defendant's failure to testify at trial.

---

**10.** Lesko's defense at trial was lack of intent. Lesko was a passenger in the car when his companion, Travaglia, shot Officer Williams during a routine traffic stop. Lesko maintained that he was a passive observer to the events.

 A violation of the rule in *Griffin* will be found where the language used by the prosecutor is intended to create for the jury an adverse inference from the failure of the defendant to testify. The *Griffin* rule however, is not an absolute bar to any reference to a defendant's failure to testify. In fact, the cases the *Lesko* court references as support for their application of the *Griffin* rule are decisions which permit reference to a defendant's failure to testify. In *United States v. Robinson*, 485 U.S. 25, 108 S.Ct. 864, 99 L.Ed.2d 23 (1988) the Court found *Griffin* was not violated where the prosecutor told the jury that the defendant did have the opportunity to tell his side of story but chose not to testify, because the comment was in response to a defense argument that the Government had prevented the defendant from presenting his side of the story. In *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the Court held that a prosecutor's closing remarks, that the State's evidence was "unrefuted" and "uncontradicted," did not violate the rule in *Griffin.*

The *Lesko* court found the principle of *Griffin* applied even though Lesko had testified at the penalty phase of the proceedings, because his testimony had been limited to mitigating information of his character and background; but, the comments by the prosecutor went beyond this area of the limited testimony and referenced Lesko's failure to testify as to the substance of the charges against him. The court in *Lesko* then went on to reject the argument that the prosecutor's remarks were a fair comment upon Lesko's demeanor as a witness and conclude that the remarks were clearly intended as a condemnation of Lesko's failure to testify about his role in the death of Officer Miller.

 As this court has noted previously, we are not bound by decisions of federal courts inferior to the United States Supreme Court, even though we may look to them for guidance in interpretation of federal case law. *Commonwealth v. Travaglia*, 541 Pa. 108, 130, n. 15, 661 A.2d 352, 363 n. 15 (1995). Based upon our analysis of *Griffin, Robinson* and *Lockett,* this court rejects the interpretation of those decisions

set forth in the Third Circuit's opinion in *Lesko.* Upon independent review of those decisions and the comments of the prosecutor in *Lesko,* we are not convinced that the comments were intended to, or had the effect of, creating in the minds of the jury an adverse inference from Lesko's failure to testify at the guilt phase of trial. Rather, we would have found the comments reference only the demeanor of Lesko as a witness at the penalty phase. The failure of a defendant to display remorse for the suffering of the victim's family and friends is as equally relevant to the character of the defendant as is the defendant's family history and socio-economic background. The comments of the prosecutor were fair response to Lesko's mitigation evidence regarding character. Thus, we would conclude that the comments did not violate the rule in *Griffin* and were in fact more consistent with the comments in *Robinson* and *Lockett.*

Having thoroughly reviewed the *Lesko* opinion upon which appellant herein relies we now turn to the specific comment to which appellant objects. As in the *Lesko* case, appellant here testified only at the penalty phase, offering mitigating evidence as to his background and character. Appellant offered testimony as to the deprivations of his impoverished childhood and how as an adult he strives to provide a good and moral example for his son to follow. Against that background the prosecutor argued to the jury: "So I ask you, Jurors, not to believe that he is such a good character that he wants to set an example to his son, because he had the opportunity and he did not. And let me just say one more thing. Not once did Mr. Clark show any remorse here." (Notes of testimony December 5, 1994 p.103).

Given the context in which these comments were made we find no violation of the rule in *Griffin.* The comments were not clearly intended to create in the minds of the jury an adverse inference from the defendant's failure to testify as to the substance of the underlying charges; the comments were a reference to the demeanor of the witness and the testimony he presented as to his character. As we reject the rationale of *Lesko,* and find no violation of the

*Griffin* rule, we also conclude that trial counsel was not ineffective in failing to object to this comment by the prosecutor in the closing argument at penalty phase.

■■■ Appellant next argues that the trial court erred in denying his request for the appointment of a second attorney. In his brief to this court appellant states that it was trial counsel who made this request and then proceeds to argue that a second attorney was needed because trial counsel's presentation of evidence at the penalty phase was inadequate. The record of the pre-trial hearing where the request was made reveals that it was appellant, not his counsel, who made the request. The trial court denied the request, at that time, stating that it would reconsider if it became apparent later in the proceedings that additional counsel was needed. (Notes of testimony November 22, 1994 p.35–38). The record is devoid of a later request for reconsideration of this ruling. In the absence of a renewed request for additional counsel, the issue is arguably waived. However, under our relaxed waiver standard, applied by this court in reviewing direct appeals in death penalty cases, we will discuss the merits of appellant's allegation. *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 454 A.2d 937 (1982), *cert. denied* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983).

■■■ Appointment of additional counsel is not a matter of right; it is a request addressed to the discretion of the trial court. A trial court possesses broad discretionary powers, necessary to effectively dispose of the multitude of issues that require its attention within the arena of litigation. *Commonwealth v. Powell,* 527 Pa. 288, 590 A.2d 1240 (1991). An appellate court will not reverse a discretionary ruling of a trial court absent an abuse of that discretion. *Coker v. S.M. Flickinger Co.,* 533 Pa. 441, 625 A.2d 1181 (1993).

■■■ Appellant's argument fails to present a basis upon which this court would find an abuse of discretion. Appellant merely sets forth a hindsight evaluation of trial counsel's presentation of evidence at the penalty phase of trial, argues that the presentation was inadequate, and then concludes that,

thus, additional counsel was improperly denied. This argument is inadequate. Appellant fails to address the actual issue: whether the trial court abused its discretion in denying the request for additional counsel.

Nonetheless, looking at the argument which appellant does present, allegations that trial counsel was inadequate for failing to present particular information at penalty phase do not lead to the conclusion that an additional attorney would have done anything different. Furthermore, appellant points to the failure of trial counsel to develop testimony as to appellant's mental health history, substance abuse, and a 1992 car accident which required physical therapy. Appellant fails to assert that trial counsel was aware of this information, the specifics of the information itself, or, to indicate how an additional attorney would have known of and utilized this alleged information. Accordingly, no basis exists on this record to conclude that the trial court abused its discretion in denying the request for appointment of additional counsel.

Next appellant asserts error by the trial court in ruling that a prima facie case of discrimination in jury selection under *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), had not been established; and ineffectiveness of trial counsel in failing to pursue this claim. A *Batson* claim arises under the equal protection provision of the Fourteenth Amendment of the United States Constitution, where a prosecutor engages in purposeful discrimination in jury selection by striking black jurors from the petit jury of a black defendant. The *Batson* rationale applies equally in cases of gender exclusion. *J.E.B. v. Alabama,* 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994); *Commonwealth v. Jones,* 542 Pa. 464, 668 A.2d 491 (1995).

Appellant is a black man. Appellant's first trial on these charges ended in a hung jury. The first jury included nine women. Appellant asserts his *Batson* claim on the premise that the prosecutor, knowing women were more sympathetic to appellant based upon the results of the first trial, used his peremptory challenges in a discriminatory manner to strike

black and women jurors. Appellant raised a *Batson* challenge during voir dire when the prosecutor had used five peremptory challenges, four which struck black women. The trial court denied the objection finding no pattern of discrimination. (Notes of testimony November 28, 1994 p.31–32). No further *Batson* objection was made. Appellant claims ineffectiveness of trial counsel for failing to renew this objection.

In *Commonwealth v. Dinwiddie*, 529 Pa. 66, 601 A.2d 1216 (1992), this Court, in applying the rationale of *Batson* to a claim of purposeful discrimination, identified the relevant factors necessary to substantiate a prima facie case of discrimination:

To establish such a case, a defendant first must show that he is of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate." Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen for the petit jury on account of their race. This combination of factors in the empaneling of the petit jury, as in the selection of the venire, raises the necessary inference of purposeful discrimination.

*Dinwiddie*, 529 Pa. at 71, 601 A.2d at 1218 *quoting, Batson*, 476 U.S. at 96, 106 S.Ct. at 1723 (citations omitted).

The record reveals the following information as to the use of peremptory challenges in selecting appellant's jury. The prosecutor exercised twenty-one preemptory challenges. Fifteen were used to strike black venirepersons, ten women and five men. Three additional women were struck by the prosecutor; their race is not identified. Neither the race nor gender of the three remaining venirepersons struck by the Commonwealth is identified on the record. Seven jurors accepted by the Commonwealth were struck by the defense, all of whom were white, four of whom were men. The defense

used fourteen peremptory challenges, twelve on white jurors, five of whom were women, one of the women was black, and one man was hispanic. The petit jury empaneled was composed of the following members: five black women, three black men, two white women and two white men.

While this record of the use of peremptory challenges by the prosecutor does show that blacks and women were struck, that fact is of itself insufficient to establish a prima facie case. Appellant must show that the use of peremptory challenges raises the inference that it was with the intent to discriminate against blacks and women. The record of voir dire does not create such an inference. Since the trial court denied the *Batson* objection when raised, the record is absent any explanation for the use of the peremptory challenges. However, the trial court who observed the voir dire process found that the prosecutor had not exhibited a pattern of race or gender discrimination.

Although the empaneling of a jury which is balanced by race and gender does not in and of itself negate a *Batson* challenge it is entitled to some weight in reviewing a *Batson* claim. In this case despite the fact that the prosecutor did strike blacks and women the petit jury empaneled consisted of seven women, five of whom were black and three black men. Based on our review of the record we find no error by the trial court in rejecting appellant's *Batson* challenge. As the record does not support a prima facie case of discrimination, trial counsel cannot be found ineffective for failing to pursue the *Batson* challenge.

In his final issue appellant asserts ineffectiveness of trial counsel for failing to investigate and present exculpatory evidence. Appellant here challenges counsel for failing to call as witnesses, Theresa Clark, appellant's mother, and Kareem Shabazz, an investigator for trial counsel. Appellant asserts that these witnesses would have either supported his alibi claim or impeached the credibility of Sherry Taggart.

Where trial counsel's ineffectiveness is premised upon failure to call witnesses it must be established that the wit-

nesses were available, willing to testify to information helpful to the defense asserted at trial, and that counsel knew of the witnesses and their proffered testimony. *Commonwealth v. Morris*, 546 Pa. 296, 684 A.2d 1037 (1996); *Commonwealth v. Stanley*, 534 Pa. 297, 632 A.2d 871 (1993). Trial counsel's awareness of Theresa Clark as a witness willing to testify for appellant is a given, as she was called to testify at the penalty phase. Mr. Shabazz is referred to as trial counsel's investigator; thus, we assume trial counsel was aware of this person as a potential witness. Given that the alleged witnesses were known to counsel and presumably willing to testify, we look to the content of the testimony appellant claims these witnesses would have provided.

The proffered testimony concerns a letter, not of record, which allegedly was written by Sherry Taggart. Ms. Taggart testified at trial that she was sweeping the parking lot of the Deli on the night of the shooting when she observed appellant enter the Deli carrying an umbrella. She noticed appellant because of the umbrella and the fact that it was not raining. When she heard the shotgun blast she ducked behind a car. She saw appellant exit the Deli with a gun. Appellant now asserts that Sherry Taggart wrote his mother a letter claiming that she is a cocaine addict and her testimony was fabricated in exchange for cocaine. Appellant claims trial counsel should have entered this letter in evidence, called his mother to testify to receiving the letter and Mr. Shabazz to testify that he interviewed Ms. Taggart who verified to him the contents of the letter.

Appellant's claim has several deficits. The letter is not of record, nor is it authenticated in any acceptable manner. Recantation testimony is exceedingly unreliable. *Commonwealth v. Anderson*, 466 Pa. 339, 353 A.2d 384 (1976). In this case, the recantation is not even offered directly through the original witness, Sherry Taggart, but through an unauthenticated letter via the testimony of appellant's mother. As for the verification offered by Mr. Shabazz, this would constitute rank hearsay, although we note that no affidavit of record appears with the proffered testimony of Mr. Shabazz.

Nor does appellant allege when this letter was received or that counsel was aware of the letter. Even if we assume that counsel knew of this letter, counsel could have made a reasonable decision not to pursue this evidence. The introduction of untrustworthy evidence would more likely hinder appellant's cause then aid it, thus, we cannot find trial counsel ineffective for failing to present this testimony.

In addition, appellant claims error by trial counsel in failing to present testimony of either the Personnel Director or the Chief Executive Steward of the Rittenhouse Hotel to confirm that appellant had interviewed successfully for a job with them on the day of the shooting. Appellant asserts this testimony would have aided his alibi as he presented two witnesses to testify that he was at home celebrating the successful interview the night of the shooting. However, trial counsel had entered into a stipulation with the Commonwealth, that appellant was interviewed at Rittenhouse Hotel on October 7, 1993, the day of the shooting, and that he was hired to begin work on Monday October 11, 1993. Given the stipulation, and the fact that the interview was during the day and the shooting was at 10:00 p.m. that night, counsel's actions were reasonable. The live testimony of these witnesses would not have significantly bolstered the defense offered at trial. Accordingly, counsel was not ineffective in failing to call any of the allegedly omitted witnesses.

Finally, in accordance with our statutory duty, 42 Pa.C.S. § 9711(h)(3), we must affirm the sentence of death unless we determine that:

(i) the sentence of death was the product of passion, prejudice or any other arbitrary factor;

(ii) the evidence fails to support the finding of at least one aggravating circumstance specified in subsection (d); or

(iii) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.

Upon our review of the record we conclude that the sentence imposed was not the product of passion, prejudice or any other arbitrary factor. We further find that the evidence was sufficient to establish the aggravating factor found by the jury. Specifically, that the appellant had a significant history of felony convictions involving force or the threat of force (two armed robberies). 42 Pa.C.S. § 9711(d)(9).

In addition, after reviewing the information compiled by our Administrative Office, the circumstances of the crime, and the character and record of appellant, in accordance with the requirements set forth in *Frey,* we do not find the sentence imposed upon this defendant to be disproportionate to the sentence imposed upon defendants in similar cases.[11] Accordingly, the judgment of sentence of death must be affirmed.[12]

ZAPPALA, J., files a concurring opinion.

NIGRO, J., files a concurring opinion in which FLAHERTY, C.J., joins.

ZAPPALA, Justice, concurring.

I agree with the conclusions reached by the majority. I write separately, however, because I agree with Mr. Justice Nigro that a jury charge pursuant to *Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), should be mandated. Accordingly, I join in that portion of his concurring opinion addressed to this issue.

11. By legislation enacted June 25, 1997 subsection (h)(3)(iii) providing for proportionality review and part of subsection (h)(4) that references proportionality review were struck from the above cited statute at 42 Pa.C.S. § 9711. *See* Act of June 25, 1997, No. 28, § 1 (Act 28), effective immediately. This court will continue to undertake a proportionality review in cases where the death sentence was imposed prior to the effective date of Act 28. *Commonwealth v. Gribble,* —— Pa. ——, 703 A.2d 426 (1997).

12. The Prothonotary of the Supreme Court is directed to transmit, as soon as possible, the full and complete record of the trial, sentencing hearing, imposition of sentence and review by the Court to the Governor. 42 Pa.C.S. § 9711(i).

NIGRO, Justice, concurring.

While I join Justice Cappy's majority opinion, I write separately to clarify my position on two of the issues that this appeal raises.

In terms of Appellant's argument concerning the trial court's instruction responding to the jury's inquiry as to the meaning of "life imprisonment," I agree with Justice Cappy's disposition of the issue since it is consistent with precedent. As Justice Cappy's opinion states, Simmons holds that a defendant is entitled to a jury instruction defining "life imprisonment" only when the issue of a defendant's future dangerousness has been raised during the penalty phase of the trial. *Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994); *Commonwealth v. Christy*, 540 Pa. 192, 656 A.2d 877 (1995) (acknowledging applicability of *Simmons* to cases in Pennsylvania decided subsequent to *Simmons*). However, I would suggest that the better practice and policy is to require trial courts to give a *Simmons* instruction in all death penalty proceedings, regardless of whether counsel raises the issue of a defendant's potential future dangerousness during the penalty phase.

Under this practice, a jury considering the death penalty would automatically be informed, before deliberations began, of what life imprisonment actually means in Pennsylvania at the time of the instruction. In my opinion, a standard *Simmons* instruction would, in the first instance, serve to clarify that issue for the jury.[1] For example, since commutation is, at this time, a possibility in Pennsylvania for those serving life sentences, and therefore proper for the jury's consideration, trial judges giving a *Simmons* instruction could be equipped with statistical information relating to the percentage of life sentences which had been commuted within the last several years.[2] Not only would the jury be aided by knowing those

1. The fact that juries are interested in the actual meaning of "life imprisonment" in Pennsylvania is reflected by the fact that in this case, with no prior guiding instructions from the court, the jury inquired as to the meaning of "life imprisonment" during penalty phase deliberations.

2. For example, here, the trial judge stated in his response to the jury inquiry: "... What percentage of life imprisonment sentences result in

percentages during their penalty deliberations, but the defendant should be entitled to have the jury aware of what statistical possibility exists that a life sentence imposed on him would result in commutation. Moreover, I can see no prejudice that the Commonwealth would suffer if every defendant facing a sentence of death received a *Simmons* jury instruction explaining, as thoroughly as possible, what "life imprisonment" means in Pennsylvania.

Secondly, I also agree with Justice Cappy that Appellant's *Batson* claim must fail. Here, Appellant asserts that the prosecutor improperly used his preemptory challenges in a discriminatory manner to strike black and women jurors during voir dire. Significantly, however, the final composition of Appellant's jury included five black women, three black men, two white women and two white men. In his majority opinion, Justice Cappy states that the empaneling of a jury which is balanced by race and gender is entitled to *some* weight in reviewing a *Batson* claim. I would suggest, instead, that a racially and gender balanced jury, while not negating a *Batson* claim in and of itself, should be afforded *substantial,* rather than only *some,* weight when a court is presented with a *Batson* claim.

Here, the ultimate composition of the jury in Appellant's case consisted of eight black persons (and four white persons) and seven women (and five men). Given this break-down, it could only logically be argued that any racial and gender disparity in Appellant's jury actually resulted from there being more women than men, and more blacks than whites. Yet, Appellant claims that the prosecutor engaged in a pattern of purposeful discrimination against women and blacks during jury selection. To me, simple common sense dictates that we give the empaneling of a racially and gender balanced jury, and certainly one consisting of a majority of members of the racial or gender group alleged to have been purposefully

commutation of sentence and parole, I can't give you. I don't have accurate statistics which I can take judicial notice on. That possibility exists."

excluded, substantial weight when determining whether an appellant's *Batson* claim has merit.

FLAHERTY, C.J., joins in this concurring opinion.