J-S42009-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| GERALD GARZONE, | |
| Appellant | No. 2141 EDA 2014 |

Appeal from the PCRA Order June 20, 2014
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0012746-2007

BEFORE:  SHOGAN, MUNDY, and FITZGERALD,[*] JJ.

MEMORANDUM BY SHOGAN, J.:                         **FILED AUGUST 27, 2015**

Appellant, Gerald Garzone, appeals from the June 20, 2014 order denying his petition filed pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541–9546.  After careful review, we affirm.

We previously summarized the facts of the crime in our disposition of Appellant's direct appeal, as follows:

> Appellants Louis and Gerald Garzone,[2] [brothers,] were licensed funeral home directors who operated separate funeral homes in Philadelphia.  Appellants were also co-owners of Liberty Crematorium in Philadelphia with co-defendant James McCafferty.  In early 2004, Appellants and Mr. McCafferty were approached by codefendant Michael Mastromarino,[3] the founder and president of a business called Biomedical Tissue Services ("BTS") that sold human tissue harvested from cadavers to tissue banks.  Mr. Mastromarino had initially partnered with

---

[*]  Former Justice specially assigned to the Superior Court.

funeral home directors in New York and New Jersey. These funeral home directors provided Mr. Mastromarino with cadavers from which he and his team of "cutters" could harvest tissue without the consent of the deceased or their next of kin and then sell to tissue banks. However, this arrangement required Mr. Mastromarino and his cutters to reconstruct the cadavers with PVC pipe after harvesting to conceal their activity and prepare the bodies for viewing and burial. Therefore, Mr. Mastromarino approached Appellants and Mr. McCafferty, who as owners of a crematorium, had access to cadavers destined for cremation and could provide these cadavers without concern for their post-harvesting condition.

> [2] Louis Garzone filed an appeal to this Court, which is docketed at 780 EDA 2009. We have addressed Louis Garzone's appeal in a separate decision.
>
> [3] Michael Mastromarino filed an appeal to this Court, which is docketed at 3443 EDA 2008. We have addressed Mr. Mastromarino's appeal in a separate decision.

Appellants and McCafferty agreed to provide bodies that had been entrusted to their funeral homes and crematorium for cremation to Mr. Mastromarino, who would then harvest bones and tissue from the cadavers to sell to tissue banks. In exchange, Mr. Mastromarino agreed to pay Appellants $1,000 for each cadaver. When Mr. Mastromarino and his cutters came to Philadelphia, Appellants would direct them to the bodies in the embalming rooms of their funeral homes. There, Mr. Mastromarino and the cutters would remove the cadavers' arms, legs, bones, ligaments, tendons, and skin, often leaving only a head and a bloody torso behind in a bag for cremation.

Between visits from Mr. Mastromarino and his cutters, cadavers destined for harvesting would sit in an alley, unrefrigerated, for days. Appellants never provided Mr. Mastromarino or his cutters with death certificates, identification, consent forms, or the names of the bodies' next of kin. Although Mr. Mastromarino told Appellants that the tissue was destined for medical use and the cadavers had to be of individuals who were less than seventy-five years old and disease-free when they died, Appellants provided cadavers of individuals who were more than eighty years old and sick with cancer, H.I.V., and hepatitis

at the time of their passing. Over the course of their arrangement with Mr. Mastromarino, Appellants provided more than 244 cadavers and received more than $245,000 in return.

In September 2005, Mr. Mastromarino learned that the FDA was investigating his activities and instructed Appellants to burn their funeral homes to the ground to destroy the evidence of their enterprises. Instead, Appellants incinerated their records in the crematory oven mere days before the arrival of FDA investigators, and told the investigators that their records had been destroyed by a flood.

In addition to providing bodies to Mr. Mastromarino, Appellants pursued other criminal activity. Appellants defrauded the Pennsylvania Department of Public Welfare ("PDPW") by filing false forms seeking reimbursement for providing funeral services to the indigent when they actually already had been compensated for those services by their clients. For each false claim, Gerald and Louis sought the maximum amount of $750 and overall received $51,750 and $25,250, respectively.

Trial Court Opinion, 6/1/09, at 2–4.

*Commonwealth v. Garzone*, 993 A.2d 306, 308–309 (Pa. Super. 2010) (internal citations to the record omitted).

The Commonwealth submitted this case to the Grand Jury in May of 2006. The Grand Jury recommended that multiple charges be filed against Appellant, and he was arrested. Trial was scheduled, various of the other co-defendants pled guilty and cooperated with the Commonwealth, and the Commonwealth prepared its numerous witnesses for trial with an estimated trial length of three months. *Id*. at 309. In connection with his participation in the illegal harvesting and sale of human body parts, as well as filing the false forms seeking reimbursement from the government for providing funeral services for which he had already been paid, Appellant ultimately

entered a guilty plea to corrupt organizations, criminal conspiracy, 244 counts of theft by unlawful taking (for theft of body parts), abuse of corpse, recklessly endangering another person ("REAP"), and fraudulently obtaining food stamps or other public assistance. On October 22, 2009, the trial court sentenced Appellant to an aggregate sentence of eight to twenty years in prison. N.T., 10/22/08, at 275–276. The trial court awarded the agreed-upon aggregate amount of restitution, which was $144,000.00. *Id*. at 276. The Commonwealth requested the costs of prosecution because, while Appellant ultimately pled guilty, it had to prepare for trial; the trial court declined to order those costs. *Id*. at 273.

The Commonwealth filed a timely post-sentence motion, following which the trial court directed Appellant to pay $90,028.00, representing the salaries of the assistant district attorneys and county detectives as well as the grand jury costs. On appeal, Appellant argued, *inter alia*, that the trial court did not have the authority to order him to pay the expenses associated with the district attorneys' salaries, the county detectives' salaries, or the grand jury costs. This Court vacated Appellant's judgment of sentence relating to the costs for the assistant district attorneys' and county detectives' salaries but affirmed in all other respects. *Garzone*, 993 A.2d at 307–308.

Upon a grant of Appellant's petition for allowance of appeal addressing the specific question of whether a trial court may order a convicted offender

to pay costs to the Commonwealth representing salaries for hours worked by assistant district attorneys and county detectives pursuant to 16 P.S. § 7708, our Supreme Court affirmed this Court. *Commonwealth v. Garzone*, 34 A.3d 67, 68 (Pa. 2012). The Court stated that "although our reasoning does not track that of the panel below, we are in agreement with its central holding that . . . the crimes in this case are particularly heinous, [and] if the General Assembly intended to permit such recovery of regularly paid salaries of assistant district attorneys and detectives to be costs associated with the prosecution, the Legislature would have expressly done so." *Id*. at 80.

Appellant filed a timely *pro se* PCRA petition on August 10, 2012. Counsel was appointed, and he filed an amended petition on September 30, 2013, raising several claims of ineffective assistance of counsel. On March 6, 2014, the PCRA court held a hearing[1] and issued a Pa.R.Crim.P. 907 notice of its intent to dismiss the petition. Appellant filed a response on April 21, 2014, and on June 20, 2014, the PCRA court dismissed Appellant's PCRA petition. Appellant filed a timely notice of appeal on July 15, 2014. Both the trial court and Appellant complied with Pa.R.A.P. 1925.

Appellant presents the following two questions for our review:

_____

[1] There are two identical transcripts in the record from this hearing, one labeled Hearing Volume I and the other labeled Motion Volume I. Our references to this hearing will be to Hearing Volume I.

1) Where trial counsel knew or should have known that much of the hysteria created at sentencing was based on wrong scientific evidence, especially after a decision in federal Multi-District Litigation amply demonstrated that fact, was Counsel ineffective for failing to file a motion to reconsider sentence?

2) Where Appellant was prejudiced by pleading guilty to one count of recklessly endangering another person, pursuant to 18 Pa.C.S. §2705, as the plea was not knowing, intelligent and voluntary, was Counsel ineffective for advising Appellant to plead guilty to that count?

Appellant's Substituted Brief at 3.

When reviewing the propriety of an order denying PCRA relief, this Court is limited to determining whether the evidence of record supports the conclusions of the PCRA court and whether the ruling is free of legal error. *Commonwealth v. Rykard*, 55 A.3d 1177, 1183 (Pa. Super. 2012). We grant great deference to the PCRA court's findings that are supported in the record and will not disturb them unless they have no support in the certified record. *Commonwealth v. Rigg*, 84 A.3d 1080, 1084 (Pa. Super. 2014).

In order to obtain collateral relief, a PCRA petitioner must establish by a preponderance of the evidence that his conviction or sentence resulted from one or more of the circumstances enumerated in 42 Pa.C.S. § 9543(a)(2). Instantly, Appellant asserted in his PCRA petition the existence of ineffective assistance of counsel pursuant to 42 Pa.C.S. § 9543(a)(2)(ii). To plead and prove ineffective assistance of counsel, a petitioner must establish: (1) that the underlying issue has arguable merit; (2) counsel's actions lacked an objective reasonable basis; and (3) actual prejudice

resulted from counsel's act or failure to act. *Rykard*, 55 A.3d 1177, 1189–1190 (Pa. Super. 2012). A claim of ineffectiveness will be denied if the petitioner's evidence fails to meet any **one** of these prongs. *Commonwealth v. Martin*, 5 A.3d 177, 183 (Pa. 2010); *Commonwealth v. Barnett*, ___ A.3d ___, 2015 PA Super 162 (Pa. Super., filed July 29, 2015). "We do not employ a hindsight analysis in comparing trial counsel's actions with other efforts he may have taken." *Commonwealth v. Stultz*, 114 A.3d 865, 881 (Pa. Super. 2015). Moreover, counsel is presumed to have rendered effective assistance. *Commonwealth v. Montalvo*, 114 A.3d 401, 410 (Pa. 2015). We have explained that trial counsel cannot be deemed ineffective for failing to pursue a meritless claim. *Commonwealth v. Loner*, 836 A.2d 125, 132 (Pa. Super. 2003) (*en banc*).

Appellant's ineffective-assistance-of-counsel claims are based upon Multi-District Litigation ("MDL"), a civil proceeding in the federal district court in New Jersey. That case consolidated all of the claims by Appellant's victims, who were recipients of the stolen bone tissue, as well as relatives of the deceased donors, against all of the tissue-distribution companies that purchased tissue samples from BTS. Summary judgment in that case, *In re: Human Tissue Products Liability Litigation*, 582 F.Supp.2d 644 (D.N.J 2008), was granted on October 22, 2008, the day Appellant was sentenced in the instant case. Appellant contends herein that the federal decision proves that the diseased parts he stole posed no risk to the

recipients and demonstrated that the fears of the tissue recipients that they could contract disease from the tissues were irrational and not grounded in science. Appellant avers that plea counsel knew or should have known of the federal decision and was ineffective for failing to file a motion for reconsideration of sentence and in failing to advise Appellant to seek to withdraw his guilty plea to REAP.

While acknowledging that the MDL opinion was not binding authority, Appellant's Brief at 19, 24, Appellant suggests the scientific evidence presented in the federal case "would have debunked the hysteria that surrounded the sentencing." *Id*. at 19. Appellant asserts that counsel's action prevented the court from having "accurate information at sentencing." *Id*. at 27. Appellant maintains that without the scientific evidence presented in the federal litigation, Appellant could not "have possibly received a fair sentence." *Id*. at 21. The Commonwealth pointedly responds that Appellant faced maximum penalties of up to 1,822 years in prison, the Commonwealth had argued for a sentence of thirty-five to seventy years of imprisonment, and the court imposed a sentence of eight to twenty years of incarceration. N.T. Hearing Vol. I, 3/6/14, at 8; Commonwealth Brief at 11. Comparatively, co-defendant Michael Mastromarino received a sentence of twenty-five to fifty years in prison. N.T. Hearing Vol. I, 3/6/14, at 10.

Regarding this issue, the PCRA court stated as follows:

> First, defendant's claim that the MDL decision provided "answers" to scientific issues at issue at sentencing in the case

at bar has no basis in the law. Decisions by federal courts inferior to the United States Supreme Court are not binding upon Pennsylvania courts. *Commonwealth v. Clark*, 710 A.2d 31, 39 (Pa. 1998); *Commonwealth v. Fahy*, 737 A.2d 214, 221 (Pa. 1999) ("It is axiomatic that decisions of our federal brethren are not binding on this court."). While federal judicial decisions may be looked to for guidance on interpretation of federal law, federal opinions are not facts, but are analysis of facts as it applies in a particular case. *Clark*, 710 A.2d at 39; *Commonwealth v. Watts*, 23 A.3d 980, 987 (Pa. 2011). Accordingly, Judge Martini's decision on a summary judgment motion pending in federal civil litigation was not evidence relevant to the sentencing decision of this Court.

Moreover, contrary to defendant's claim, the MDL decision did not resolve, even in the federal litigation, the issue of the risk to victims who received the diseased tissue stolen by defendant. The specific question before the federal court on the summary judgment motion was "whether Plaintiffs' experts have reliably concluded that the diseases at issue can be transmitted beyond thirty days and that the incubation periods for HBV, HCV, and HIV are beyond six months."[2] *Id*. at 655. The district court concluded:

> [2] HBV, HCV, and HIV stand for Hepatitis B Virus, Hepatitis C Virus, and Human Immunodeficiency Virus, respectively.

> (1) Unprocessed bone tissue and bone paste stored at room temperature for thirty (30) days or more is not capable of transmitting HBV, HCV, HIV, syphilis, or cancer;

> (2) Unprocessed bone tissue and bone paste is not capable of transmitting prion disease;

> (3) Federal plaintiffs who have tested negative for HBV, HCV, HIV, and syphilis more than six (6) months after their bone tissue or bone paste transplant surgery cannot establish general causation with respect to HBV, HCV, HIV, and syphilis.

*Id*. at 692. The court further specifically stated that it was not deciding any further issues, and did not grant complete summary judgment to the civil suit defendants. *Id*. Accordingly, the MDL decision did not address the risk to the tissue recipients who received materials stored for less than 30 days, the risk to the tissue recipients of contracting one of the specified diseases through tissue other than bone or bone paste, or any of the other numerous medical risks to patients from receiving diseased and inferior tissue unrelated to the specific diseases addressed in the summary judgment motion.

In addition, and perhaps most importantly, the arguments that were presented to Judge Martini were presented to, and considered by, the sentencing court in determining defendant's sentence. In particular, the sentencing memorandum filed on behalf of co-defendant Louis Garzone forcefully argued that the "indisputable scientific consensus exists that defendant's deeds did not affect the health or safety of any person," based upon the arguments advanced by the civil defendants in the MDL litigation. *See* Louis Garzone's Sentencing Memorandum at pp. 10-11. Counsel even attached as an exhibit to his sentencing memorandum, for the review and consideration of this Court, the 44 page memorandum from the defense in the MDL case setting forth the basis for Judge Martini's decision.

Finally, the Court can state unequivocally that the presentation of the MDL decision would not, in any manner, have caused the Court to give defendant a more lenient sentence. The aggregate sentence imposed by the Court took into account every bit of mitigating evidence presented by the Garzones, including the scientific evidence from the MDL litigation, and was, under the remarkable circumstances of this case, a generous sentence for defendant.

Accordingly, the record establishes that the MDL decision did not give rise to new information that would bear upon the Court's sentencing decision. For that reason, it is clear that no prejudice resulted from counsel's failure to file a motion for reconsideration of sentence based on the MDL decision. Therefore, the Court properly found that counsel's failure to file a motion for reconsideration did not deprive defendant of effective assistance of counsel.

PCRA Court Opinion, 10/3/14, at 6–8.

While Appellant refers to the MDL decision as scientific evidence, we agree with the Commonwealth and the PCRA court that the decision is not evidence; rather, it is a non-binding legal conclusion "rendered by a judge in a different jurisdiction" in civil litigation. Commonwealth's Brief at 13 (citing PCRA Court Opinion, 10/3/14, at 8). Moreover, Appellant cannot establish prejudice in this matter. Appellant is seeking resentencing. The PCRA court clearly stated that it had the information presented in the federal litigation because counsel for Louis Garzone appended it to his sentencing brief, the studies were compelling, and they were the reason the lower court imposed the lenient sentence it did instead of "the 35 to 70 years that was asked for by the Commonwealth." N.T. Hearing Vol. I, 3/6/14, at 10. The PCRA court advised that the forgone post-sentence motion "wouldn't have mattered," because Appellant "made out so well, he should be kissing the ground every day . . . and thanking [plea counsel] for extricating him from a case with an eight to 20 year sentence for which he's very fortunate he's not spending another 20 years in prison for." *Id*. at 11.

> [T]o satisfy the prejudice prong, it must be demonstrated that, absent counsel's conduct, there is a reasonable probability that the outcome of the proceedings would have been different. ***Commonwealth v. Charleston***, 94 A.3d 1012, 1019 (Pa. Super. 2014). If it has not been demonstrated that counsel's act or omission adversely affected the outcome of the proceedings, the claim may be dismissed on that basis alone, and the court need not first decide whether the first and second prongs have been met.

- 11 -

*Commonwealth v. Perez*, 103 A.3d 344, 348 (Pa. Super. 2014). Even if

plea counsel had filed the post-sentence motion, Appellant would not have

received a lesser sentence. Thus, he has not established that but for the

alleged error of counsel, there is a reasonable probability that the outcome

of the proceeding would have been different.

Appellant next argues that the guilty plea to REAP was not knowing,

intelligent, and voluntary, and plea counsel rendered ineffective assistance

for advising Appellant to plead guilty to that count.[2] We rely on the PCRA

court's reasoning, as follows:

> Defendant next claims that trial counsel was ineffective, as he "should have sought to withdraw the plea as to the REAP count because the sentence was based on inaccurate information and/or because the MDL opinion was newly discovered evidence which Counsel should have presented to the Court …. Counsel should have sought to withdraw a plea to the REAP count based on this newly discovered evidence." Statement of Errors at ¶ 2.
>
> [T]he MDL decision was not evidence of any kind, but rather a legal conclusion rendered by [a] judge in a different jurisdiction in civil litigation. Accordingly, any motion premised upon the MDL decision as "newly discovered evidence" would have been frivolous. . . .
>
> Moreover, the legal conclusions set forth in the MDL decision, even if considered to be "evidence," would not undermine defendant's guilty plea to REAP. To be guilty of REAP, a person must "recklessly engage in conduct which places or may place another person in danger of death or serious bodily injury." 18 Pa.C.S. § 2705. As stated above, the MDL decision explicitly limited its ruling to the risk of specific communicable

---

[2] Significantly, there was no further penalty imposed on the REAP charge. N.T. Sentencing, 10/22/08, at 275–276.

diseases transmitted to recipients who received bone or bone paste tissue stored at room temperature for more than 30 days. It did not purport to address other risks to patients from receiving the diseased and substandard tissue, including the risks of contracting the specified diseases through tissue other than bone or bone paste, or any risks at all to patients who received tissues stored for less than 30 days. Defendant admitted to harvesting aged and diseased tissues that he caused to be transmitted to unknowing medical providers who used that tissue to treat unknowing patients. Nothing in the MDL decision undermined the compelling evidence that this conduct provided grave risks to tissue recipients.

* * *

Defendant's Statement of Errors does not specify the advice that he received from trial counsel that is alleged to be flawed. Assuming that the flawed advice was that he was guilty of REAP notwithstanding the MDL decision, then his argument should be rejected for the reasons set forth in section III(B), above. As stated there, the MDL decision in no way undermined defendant's guilt of REAP. To the extent that defendant's claim is premised upon some other unspecified flawed advice, the Court is unable to address the claim due to lack of specificity. *See, e.g., Commonwealth v. Cannon*, 954 A.2d 1222, 1228 (Pa. Super. 2008), *app. denied*, 964 A.2d 893 (Pa. 2009) (where a defendant makes a vague and generalized objection on appeal that leaves the trial court to guess at his claims, those claims are deemed to have been waived).

PCRA Court Opinion, 10/3/14, at 8–10.

In his appellate brief, Appellant focuses on his state of mind, suggesting that the PCRA court failed to address his claim that he lacked the necessary *mens rea* for REAP because "there was not an actual present ability to inflict harm nor was there any evidence that actual physical harm had ever been inflicted upon anyone." Appellant's Brief at 28. Thus, Appellant contends that counsel should have either counseled Appellant not

to plead guilty to REAP or sought to withdraw the plea to REAP. *Id*. As the Commonwealth poses, that precise claim was not advanced in Appellant's Pa.R.A.P. 1925(b) statement and therefore is waived. *Commonwealth v. Riggle*, ___ A.3d ___, 2015 PA Super 147 (Pa. Super., filed July 7, 2015).

Even if not waived, the issue lacks merit. The guilty plea colloquy revealed that Appellant knew the harvested tissue was to be sold for transplantation into people and that the cadavers were required to be individuals under seventy-five years old who did not have certain diseases. Despite this knowledge, Appellant provided bodies of people in their "late 80s" who "were riddled with cancer and infected with . . . HIV and hepatitis"; he did not disclose the identities of the bodies; and the bodies he provided "were not fresh," as was required for safe transplantation. N.T. Guilty Plea, 9/2/08, at 27–32. Appellant acknowledged under oath that the substance of the factual summary was true and stated that he was pleading guilty because he was guilty. *Id*. at 42.

Appellant now relies upon a statement from Lee Cruceta, a co-conspirator, that the "processing performed by RTI and others made it impossible to transmit disease from transplanted bone." Appellant's Brief at 30. In pertinent part, the statement upon which Appellant relies, attached to his amended PCRA petition, is as follows:

> [Question:] While you were at the Philadelphia Funeral homes did you ever have any conversations about where tissue would go when you left?

- 14 -

[Answer:] Yes. I had a conversation with [Appellant] where he asked where the tissue would go and I told him it would be used for transplantation. It would be sent to a processing [company] to be sterilized, processed and used in various orthopedic procedures.

[Question:] Did you have any other conversations regarding changes that had or would occur in the harvesting procedures of tissue at the Philadelphia Funeral Homes?

[Answer:] Yes, I had a conversation with [Appellant] about how when we first started we would harvest certain tissues ("long bones"] and use small incissions. Now we were skin, spines and more tissue. He felt if [co-defendant] Michael [Mastromarino] was making more money then He ([Appellant]) should be getting more money. He was talking to me to have me tell Michael about it.

Amended PCRA petition, 9/30/13, at Exhibit B, pp. 2–3; Appellant's Brief at 30.

This statement, which was available to Appellant when he pled guilty, does not negate the facts read into evidence during the plea colloquy, nor does it show that Appellant believed the tissue was safe. Rather, it confirms that Appellant knew it was being used for transplantation, and that his co-conspirators had begun harvesting skin, spines, and tissues other than bones. We conclude the issue lacks arguable merit.

Order affirmed.

Justice Fitzgerald did not participate in the consideration or decision of this case.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/27/2015