750 A.2d 243

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Philip TRIVIGNO, Appellant.**

Supreme Court of Pennsylvania.

Argued April 27, 1999.

Decided March 24, 2000.

234

236

Norris E. Gelman, Philadelphia, for appellant Philip Trivigno.

Catherine Marshall, Philadelphia, for appellee Com.

Thomas Dolgenos, Philadelphia, Robert A. Graci, Harrisburg, for appellee, Office of the Atty. Gen.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

*OPINION ANNOUNCING THE JUDGMENT*
*OF THE COURT*

NEWMAN, Justice.

On September 27, 1996, a jury convicted Appellant Philip Trivigno (Trivigno) of first degree murder in the slaying of Frank Varano (Varano) and on October 1, 1996 sentenced him to death. This is a direct appeal of this verdict. For the reasons that follow, we affirm the verdict of guilt, but vacate the sentence of death and remand for a new penalty phase hearing.

## I. *FACTUAL AND PROCEDURAL BACKGROUND*

In November of 1993 Trivigno and the victim, Varano, argued during a court proceeding involving Trivigno and a friend of Varano's, Martin Dougherty (Dougherty). Dougherty had asked Varano to accompany him to court because he was "frightened." (N.T., 9/24/96 at 34.) While at court, Trivigno made a snide comment to Dougherty to which Varano asked, "you got a problem?" (*Id.* at 35.) The exchange escalated and Trivigno threatened, "We will take care of it later." (*Id.*) In the court appearances that followed, Varano and Trivigno continued to have heated words and according to Dougherty, on each occasion, Trivigno indicated that he would, "take care of it later." (*Id.* at 40, 43, 45.)

More than a year following the conclusion of the court proceedings, on December 9, 1995, at about 7:00 a.m., Varano and his wife, Cheryl, went to an alley near the intersection of Palethorpe and Lehigh Streets in North Philadelphia to buy heroin (Palethorpe is a small street near Second and Lehigh). They had been going to this location on a daily basis for several months before the incident. According to the trial testimony of Cheryl Varano, her husband parked their red GEO, in a parking lot next to Palethorpe Street and he then walked up to a nearby alley to buy drugs. After a few moments, Cheryl Varano heard two or three gunshots and she saw her husband come back to the car, holding his hand over his stomach and saying, "Hon, I got shot, I got shot." (N.T.,

238

9/25/96 at 135.) He got into the car and slumped over the steering wheel. Cheryl Varano saw Trivigno run toward the car, approach the passenger side, point his gun at her, and shoot her through the car window. As she defensively placed her arm to cover her head, the bullet traveled through her hand and grazed the side of her head, above her eye. Trivigno then reached through the broken passenger side window and shot her husband in the head, killing him. Trivigno ran from the car, but came back, attempting to shoot Cheryl Varano again, but the gun did not fire. After the gun misfired several times, Trivigno fled back up Palethorpe Street, got into a car and drove away. During this entire ordeal, Cheryl Varano had a clear view of Trivigno, as he was mere feet away from her when he shot her and her husband in the car. About five days after the shooting, Cheryl Varano picked Trivigno out of a photo array and testified at trial that she had no doubt that he was the man who shot her and her husband.

That morning gunfire awoke many residents on Palethorpe Street. Mildred Rivera (Rivera) testified that she was on the second floor of her home when she heard the shots. She saw a man, who she later positively identified as Trivigno, running on Palethorpe Street towards a red car, shooting. Rivera opened her window and stuck her head out to get a better view. She went on to testify that she had a good view of Trivigno given that the situation occurred about two doors from her own home and at one point Trivigno looked directly up at the location where she was peering out of her window. Rivera saw Trivigno approach the car, break the "windshield," stick his whole hand inside the car and shoot Varano, who she saw sitting in the driver's seat. (N.T., 9/24/96 at 76.) Rivera stated that Trivigno left, then came back, and started firing at Cheryl Varano, who was still sitting in the passenger side of the car. Rivera heard the gun misfire, stating that it went "click, click." (*Id.*) She saw Trivigno leave the scene and proceed back towards Lehigh Street, where a "Cadillac with yellow tags" was waiting for him. (*Id.* at 78.) Trivigno got into the car and it sped away. On cross-examination, defense counsel elicited that Rivera was uncertain about the make of

the car, but that it looked like a Cadillac and she was unsure whether the car was white or beige. Rivera stated that on the morning in question it was snowing, so the car looked white.

Another resident, Jose Romon (Romon), testified that he heard people shouting, and he looked out his second floor window. He saw a man shoot another man, then run down Palethorpe Street, past his house down to Lehigh Street, jump into a Lincoln and speed away down Lehigh towards Front Street. Although unable positively to identify the shooter, Romon could get the license plate number of the car, AVB 7336, which he yelled to his wife, Betsey Colon (Colon), who wrote down the numbers of the license. Romon also stated that he recognized the driver of the car, but that person was not in the courtroom. Romon testified that the car he saw was a medium or light brown Lincoln. Romon stated that he was "100 percent" sure that the car was a Lincoln, because he was a mechanic, who had done auto body work. (N.T., 9/25/96 at 29–30.) When asked to point to a color that resembled the car color that he saw, he identified a burgundy colored briefcase. Colon also testified, verifying the license plate number that she had written down was AVB 7336 and that she saw the plate number and she saw the man hop into the getaway car.

Detective Santiago, the homicide police detective who conducted the investigation, testified that he traced the license plate number that Romon and his wife had written down to a burgundy Lincoln, registered at 333 Daly Street and owned by a Philip Bastile (Bastile). However, the car led back to Trivigno. Detective Santiago determined that a Lincoln with the license plate number AVB 7336 had accumulated a number of tickets around the corner from the street where Trivigno lived with his grandmother and also near a jewelry shop that Trivigno's father owned and where Trivigno worked in December of 1995. Further, Trivigno's sister lived at 333 Daly Street, the address where the car was registered, but when Detective Santiago went to that address he received no information regarding Bastile. Additional investigation suggested that Trivigno's father (Trivigno, Sr.) had sold the car to Bastile. However, when asked about information concerning

Bastile, Trivigno Sr. gave conflicting stories concerning his identity, and no information as to his location. Detective Santiago testified that Trivigno Sr. told him that he met Bastile at his store, and that Bastile was a homeless man who had a diamond worth $10,000, which he wanted to trade for a car to use as his home.

At trial Trivigno, Sr. gave a completely different version of the sale of the car at issue. He testified that in January of 1995 he owned a 1988 burgundy Lincoln sedan, but that he transferred it to Bastile. He stated that, at the time of the sale, he was aware that the vehicle would be registered to a man living at his daughter's address. Trivigno, Sr. described the man as looking like his son. Trivigno, Sr. testified that he, his son and Bastile went to the establishment to transfer ownership of the automobile, however, Trivigno, Sr. could not recall any specific details of the deal. He gave conflicting details of where the transaction took place (on either Girard Avenue or Baltimore Avenue) and indicated that Bastile drove a car to the location. The police did extensive investigation and found no record that Bastille ever existed.. Undoubtedly, the jury was left with the impression that it was Trivigno's Lincoln that was the getaway car.

## II. *ISSUES ON APPEAL*

Trivigno raises the following issues for this Court to review:

1) whether reversible error occurred because the prosecutor's comments during closing arguments improperly referred to his failure to testify;

2) whether trial counsel was ineffective for a number of claimed errors; and,

3) whether Trivigno is entitled to a new penalty phase hearing because the prosecutor argued the future dangerousness of Trivigno and the trial court erred in refusing to give a "life means life" instruction.

In addition, because this is a death penalty case, we conduct an independent review of the sufficiency of the evi-

dence supporting the jury's verdict of guilt on the charge of first degree murder. *Commonwealth v. Clark,* 551 Pa. 258, 710 A.2d 31, 34 (1998), *cert. denied,* — U.S. —, 119 S.Ct. 1465, 143 L.Ed.2d 550 (1999) (citations omitted).

## III. *DISCUSSION*

### A. *Sufficiency of the Evidence*

The analysis we use to determine if the evidence was sufficient to sustain the conviction for first degree murder is, whether after viewing all the evidence in the light most favorable to the Commonwealth, as verdict winner, the evidence is sufficient to enable the trier of fact to find every element of the crime of first-degree murder beyond a reasonable doubt. *Id.* To find a defendant guilty of first-degree murder a jury must find that the Commonwealth has proven that defendant unlawfully killed a human being and did so in an intentional, deliberate and premeditated manner. It is the element of a willful, premeditated and deliberate intent to kill that distinguishes first-degree murder from all other criminal homicide. *Id.* Specific intent to kill may be inferred from the defendant's use of a deadly weapon upon a vital party of the victim's body. *Id.*

With this standard in mind, we have reviewed the evidence and have found it sufficient to support the jury's verdict. As stated above, two eyewitnesses (Cheryl Varano and Rivera) had a clear view of the shooting. Both positively identified Trivigno as the man they saw follow Varano and shoot him in the head after Varano fled to his car. Both of these witnesses also saw Trivigno fire at Cheryl Varano; and, other witnesses placed what the jury could undoubtedly conclude was Trivigno's car at the scene of the crime. These facts establish that Trivigno shot and killed Varano and that he did so in a deliberate and intentional manner. Consequently, there was sufficient evidence to support the verdict of first-degree murder.

We now turn to the specific issues that Trivigno has raised.

### B. *The Prosecutor's Comments During Closing Argument*

We discuss first whether Trivigno is entitled to a new trial because, in violation of *Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), the assistant district attorney made statements that improperly commented upon Trivigno's failure to take the stand. For the reasons that follow, we conclude that the remarks were not improper under the circumstances. They could not have contributed to the verdict against Trivigno, and he is not entitled to a new trial.

During the closing arguments, defense counsel informed the jury of the fundamental precept that a defendant in a criminal trial is presumed innocent and that the Commonwealth has the burden to prove that he is guilty of the crime charged. (N.T., 9/26/96 at 53–55.) Counsel then explained in some depth the reasons for that burden and urged the jury to apply this presumption of innocence in favor of Trivigno. In this context, the defense lawyer explained the reasons that he had not presented any evidence and stated that:

> fundamentally our defense in this case *by virtue of Mr. Trivigno's not guilty plea is I didn't do it.* You say I did it, Commonwealth, your job is to prove it beyond a reasonable doubt.

(*Id.* at 55, emphasis added.) Counsel then continued to attempt to persuade the jury that the Commonwealth had not met its burden of proof and pointed to a number of scientific journals that questioned the accuracy of eye witness accounts of crime.

During the Commonwealth's closing remarks, the assistant district attorney argued that Trivigno's counsel was actually asking the jury to guess and speculate about evidence that was not presented in the courtroom. (*Id.* at 72.) Reminding the jury that they could base their decision solely upon the evidence and not guesswork, the assistant district attorney then made the following comment:

> Ladies and Gentlemen, we're simply asking you to do your job based on what happened in this courtroom, not on references to the fact of a plea of not guilty being an

expression I didn't do it. *You didn't hear the words "I didn't do it" from that witness stand in this courtroom at all.*

(*Id.* at 72, emphasis added.)

The attorney for Trivigno promptly made an objection, which the trial court sustained, but counsel did not ask for a cautionary instruction at this time.[1] *Id.* Continuing with his closing, the assistant district attorney then stated:

*You only heard the entering of a plea.* I'm asking you to go not what might be in scientific journals that counsel has evidently studied up on about the reliability of eyewitness [sic] or whether or not there is a National Crime Information center or whether or not NASA put a man on the moon. *I'm only asking you to decide the case based on the evidence that came from that chair up there and the exhibits that were offered to you . . .*

(*Id.* at 73, emphasis added.)

Following this closing, the defense attorney asked for a side bar, at which time counsel again objected to the prosecutor's reference to the failure of Trivigno to testify. He then requested a mistrial. (N.T., 9/29/96 at 102–103.) The trial court refused to grant a mistrial because it found that the prosecutor's comment was in fair response to counsel's statement (that Trivigno's not guilty plea means that he "didn't do it"), and found that a cautionary instruction could cure any prejudice. (*Id.* at 103–05.) We agree with the disposition of the trial court.

As a general rule, any comment that the prosecuting attorney makes regarding a defendant's election not to testify is a violation of the defendant's right against self incrimination as guaranteed by the Fifth Amendment of the United States Constitution, Article I, Section 9 of the Pennsylvania Constitution and by statute, codified at 42 Pa.C.S.A. § 5941.[2] *Com-*

1. Note that the record reflects that the trial court indicated that he would have given such cautionary instruction if requested. (N.T., 9/26/96 at 104–05.)

2. Legislation prohibiting comment, by the court or prosecutor, concerning the failure of a criminal defendant to testify on his own behalf, has

monwealth v. Camm, 443 Pa. 253, 277 A.2d 325, 330 (1971), cert. denied, 405 U.S. 1046, 92 S.Ct. 1320, 31 L.Ed.2d 589 (1972). A comment is constitutionally and statutorily forbidden if "the language used by the prosecutor is intended to create for the jury an adverse inference from the failure of the defendant to testify." *Commonwealth v. Clark*, 551 Pa. 258, 710 A.2d 31, 39 (1998), cert. denied, 526 U.S. 1070, 119 S.Ct. 1465, 143 L.Ed.2d 550 (1999). This rule is not an absolute bar to any reference to a defendant's failure to testify. *Id.* See also *Commonwealth v. Rolan*, 520 Pa. 1, 549 A.2d 553 (1988).[3] A remark by a prosecutor, otherwise improper, may be appropriate if it is in fair response to the argument and comment of defense counsel. *United States v. Robinson*, 485 U.S. 25, 31, 108 S.Ct. 864, 99 L.Ed.2d 23 (1988).

In *Robinson*, the defendant was on trial for insurance fraud (he set his home on fire to collect the insurance). Defense counsel argued in his closing that the "government" had not given the defendant the opportunity to explain his side of the story. In response, the prosecutor stated in his closing that the defendant "could have taken the stand and explained it to you, anything he wanted to." 485 U.S. at 26, 108 S.Ct. 864. The United States Supreme Court held that the prosecutor's direct comments concerning the defendant's failure to take the stand were not in violation of *Griffin* because the statements were in fair response to the argument of the defendant and did not treat the defendant's silence as substantive evidence of guilt. 485 U.S. at 32, 108 S.Ct. 864. The Court stated:

existed in this Commonwealth since 1887. *See* Act of May 23, 1887, P.L. 158, Sec. 10; *Commonwealth v. Lewis*, 528 Pa. 440, 598 A.2d 975, 977 (1991).

3. In *Rolan*, the district attorney in his closing stated that, "You have heard absolutely no evidence that would indicate otherwise, none whatsoever." 549 A.2d at 556. The trial court refused to grant a mistrial, but gave a cautionary instruction. We determined that the prosecutor's remark did not reflect adversely upon the defendant's decision not to testify, holding that the "statement was a simple declamation that all evidence lead unerringly to the conclusion that Appellant had committed the murder." *Id.* We further held that "in any event, the trial court's immediate and adequate cautionary instruction cured any possible prejudice." *Id.*

In the present case it is evident that the prosecutorial comment did not treat the defendant's silence as substantive evidence of guilt, but instead referred to the possibility of testifying as one of several opportunities which the defendant was afforded, contrary to the statement of his counsel, to explain his side of the case. Where the prosecutor on his own initiative asks the jury to draw an adverse inference from a defendant's silence, *Griffin* holds that the privilege against compulsory self-incrimination is violated. *But where as in this case the prosecutor's reference to the defendant's opportunity to testify is a fair response to a claim made by defendant or his counsel, we think there is no violation of the privilege.*

*Id.* (emphasis added). *See also Commonwealth v. Clark, supra,* (holding that prosecutor's comment that defendant failed to show remorse was in fair response to defense closing argument); *Commonwealth v. Abu-Jamal,* 553 Pa. 485, 720 A.2d 79, 116 (1998); [4] *Commonwealth v. Rhone,* 422 Pa.Super. 521, 619 A.2d 1080, *alloc. denied,* 534 Pa. 653, 627 A.2d 731 (1993).[5]

When we apply these rules of law to the facts of this case, we find that the remark at issue was in fair response to

**4.** In *Abu-Jamal,* the prosecutor commented during the penalty hearing that, "you heard nothing at all, ladies and gentleman, in reference to testimony as to any kind of emotional feelings on the defendant's part because he has, as his absolute right, he did not choose to take the stand and testify what the circumstances were." 720 A.2d at 116. We held that this language was not an attempt to have the jury draw an adverse inference from the failure to testify. Instead, it was "made in response to the comments made during the defense closing wherein the defense argued in mitigation that in shooting Officer Faulkner Appellant was acting under emotional disturbance." *Id.*

**5.** In *Rhone,* Counsel for defense had stated, "My client pled not guilty, he meant it. He meant it." 619 A.2d at 1082. The assistant district attorney responded in his closing argument that while the defense attorney said the "defendant pled not guilty and he meant it. I don't know if he meant it or not. ... it is not his testimony under oath ... You can't hold it against the Defendant that he didn't testify. But, but keep in mind that he did not testify, it is the defense attorney who has said these things." 619 A.2d at 1082–83. The Superior Court refused to grant defendant a new trial, holding that the prosecutor's comments were in fair response to the comments of the defense counsel.

the statements of defense counsel and was not intended to create an adverse inference pertaining to the failure of Trivigno to testify. Defense counsel's comment misinformed the jury of the effect of a guilty plea and constituted impermissible testimony ("I didn't do it") from counsel, when no such testimony had been presented at trial. In light of this misinformation, we can find no error in the conclusion of the trial court that the comments of the district attorney were intended to respond to counsel's misinformation and to inform the jury correctly of the effect of the not guilty plea. The prosecutor did not intend to create for the jury an adverse inference from the failure of the defendant to testify. Hence, the trial court properly refused to grant a mistrial.

Even if we determine that the assistant district attorney's remark was not in fair response to the statements of defense counsel, but instead that he erroneously commented on the defendant's failure to testify, this error does not warrant a new trial because it was harmless. Trivigno does not contend otherwise, but cites to *Commonwealth v. Edwards*, 535 Pa. 575, 637 A.2d 259 (1993), apparently arguing that any comment that refers to the defendant's failure to testify is per se reversible error. We disagree.

We have previously held that an improper reference to the defendant's failure to testify is harmless if the Commonwealth establishes, beyond a reasonable doubt that:

> the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

*Commonwealth v. Rodriguez*, 533 Pa. 555, 626 A.2d 141, 144 (1993). *See also Commonwealth v. Nolen*, 535 Pa. 77, 634 A.2d 192, 197 (1993) (holding that references to defendant's silence are harmless "where it is clear that the error could not have contributed to the verdict.")

Here, the properly admitted and uncontradicted evidence of Trivigno's guilt was overwhelming, and the statement of the prosecutor could not have, in any way, contributed to the

jury's verdict against him. Two eyewitnesses testified that they saw Trivigno shoot Varano. One of these eyewitnesses, Cheryl Varano, was less than a foot from Trivigno when he leaned into the Varanos' vehicle, on the side where Mrs. Varano was sitting, and shot her and her husband. Moreover, Romon identified the car that Trivigno rode away in as a "Lincoln" and the license plate was traced to Trivigno Sr. at the address of Trivigno's sister. Although Trivigno, Sr. claimed that he sold this car to Bastile, a homeless man, his story was incredible in light of the fact that he gave conflicting and unbelievable stories to the police; and, the car was registered at the address of Trivigno's sister (yet she apparently had never heard of Bastile.) Further, at trial, the police testified concerning extensive efforts to locate Bastile; and, there was absolutely no record or other evidence that Bastile ever existed. In addition, the jury heard testimony of a series of arguments that had occurred between Trivigno and the victim, in which Trivigno threatened to "take care of it later."

The only area of evidence that Trivigno points to as contradicted is the identification of the getaway car. Trivigno argues that there was contradictory testimony from Rivera and Romon about the color of the car and that some witnesses told police that the license plate number of the vehicle was either "AUB" or "AWB" 7336 (not "AVB" 7336, as Romon indicated.) These alleged contradictions are not significant. While Rivera testified that the car Trivigno drove away in probably was a white or beige Cadillac, she said she was not certain because it was snowing so that most of the car looked white. Further, although Romon, the witness who wrote the license plate down, testified initially that the car was medium or light brown, when asked more specifically, he indicated that it was the color of the attorney's briefcase, which was burgundy (notably the color of Trivigno's Lincoln). Romon, a mechanic who did auto body repair, was a particularly believable witness on the identification of the car. At the time of the shooting, he told the police that he was 100 percent certain that the automobile was a Lincoln. He was at the best vantage point on Palethorpe Street to observe the vehicle as it

sped away (Rivera was closer to where the shooting took place and Romon was closer to where Trivigno ran and jumped into the getaway car).

Because Rivera identified the automobile as a Cadillac rather than a Lincoln is not significant, particularly where she expressed some uncertainty as to the make of the car and to the untrained eye, the body type of a Cadillac is very similar to that of a Lincoln. Also, it is not significant that Romon and Rivera, who both needed interpreters during the trial, indicated in English that the car color was beige or light brown, whereas the color of Trivigno's was burgundy. Particularly here, where when shown an actual color with which to compare the car's color, Romon was able to say that the burgundy briefcase was the closet color to the car he saw on December 9, 1995.

Trivigno points to no other Commonwealth evidence that was contradictory. Given this, and the fact that the trial court gave a number of cautionary instructions to the members of the jury, stating that they could not draw an adverse inference from Trivigno's failure to testify, there is no reasonable doubt that the assistant district attorney's passing reference to "decid(ing) the case based on the evidence that came from that chair up there" did not contribute to the jury's verdict in this matter. *Commonwealth v. Nolen*, 634 A.2d at 196–97. *See also Commonwealth v. Maloney*, 469 Pa. 342, 365 A.2d 1237, 1241 (1976)(ruling that, where prosecutor made improper reference to defendant's silence, "in Pennsylvania adequate instructions under some circumstances may cure error of the nature here complained of.")

We thus conclude, based on the particular facts of this case, that the prosecutor's statement was harmless, even if an improper comment on the defendant's failure to take the stand. In reaching the conclusion that the prosecutor's statement was harmless error, we are mindful that such a conclusion in these circumstances is not to be arrived at lightly. *Commonwealth v. Davis*, 452 Pa. 171, 305 A.2d 715, 720 (1973). However, in this case, the properly admitted evidence was so overwhelming that there is no doubt that the prosecutor's

passing reference in no way contributed to the jury's verdict in this manner. *E.g., Commonwealth v. Nolen, supra.* Thus, the trial court did not err in refusing to grant a mistrial.

## C. *Ineffective Assistance of Counsel*

Trivigno next contends that he is entitled to a new trial because of several errors that his attorney made during the guilt phase of the trial. In particular: (1) delivering a summation that extended an invitation to the prosecutor to make a comment about his decision not to testify; (2) failing to object to the prosecutor's questioning of Romon, which inferred that defendant had bribed this witness; and, (3) failing to object to the trial court's *"Kloiber"* instruction. To prevail on his assertion that trial counsel was ineffective, Trivigno must show that his underlying claim has merit, that his lawyer had no reasonable basis for the act or omission in question, and that because of this claimed error, he was prejudiced. *Commonwealth v. Pierce,* 515 Pa. 153, 527 A.2d 973, 976 (1987). We find that Trivigno has failed to establish that the alleged mistakes of his counsel warrant a new trial.

### 1. *Comments of Defense Counsel During Closing Argument:*

Trivigno first argues that if we refuse to grant him a new trial on the alleged *Griffin* violation discussed *supra*, we should order a new trial because counsel was ineffective for "opening the door" to the comment about Trivigno's failure to testify. We reject this claim. While Trivigno's claim may have arguable merit, he has not shown that the attorney failed to have a reasonable basis for his action; and, as set forth above, Trivigno was not prejudiced. Comments by the prosecutor could not have influenced the jury's verdict because the evidence against Trivigno was overwhelming. His claim thus fails.

### 2. *The Prosecutor's Cross–Examination of Romon:*

Citing *Com. v. Perillo,* 474 Pa. 63, 376 A.2d 635 (1977), Trivigno further argues that counsel was ineffective because he failed to object to certain of the prosecutor's

statements in the cross-examination of Romon. When first called to the stand, Romon began by quickly stating only that he saw a car drive away, and he heard some screams. The prosecutor then confronted Romon with his earlier statement that he had given to police shortly after the shooting. In this statement, he told the police that he saw two men arguing and then one man pulled a gun, shot the other man and fled in a Lincoln. Romon further indicated in this statement to police that he saw the car's license plate. Romon, after being confronted with the statement and after obtaining a Spanish interpreter, adopted his earlier statement to the police. In the course of the cross-examination, the district attorney questioned Romon as to why he had previously stated that all he saw was a car going away. In that context, the prosecutor asked Romon whether "anybody approached" or "threatened" or "offered [him] money or any consideration in order to withhold testimony." (N.T., 9/24/96 at 32–33.) Romon denied any of this and testified simply that he had been nervous.

Trivigno claims that the comments of the assistant district attorney attributed criminal conduct (bribery) on the part of the defense. Trivigno argues that while the witness denied the conduct, the witness could not very well have admitted to this on the stand. Citing *Arizona v. Fulminante,* 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) and *Commonwealth v. Karaffa,* 551 Pa. 173, 709 A.2d 887 (1998), he further asserts that the failure to object was a "structural" error, which went to the heart of the proceedings and does not require a separate showing of prejudice.

We disagree. Unlike *Perillo,* the exchange between the district attorney and the witness was not dramatic and was not prejudicial. *Perillo,* 376 A.2d at 638–39. The prosecutor did not disobey any of the rulings of the trial court. Indeed, when the record is read in its entirety, it is clear that Romon stated that the reason that he initially testified differently than in his police statement was that he was nervous. Mr. Roman had difficulty at times expressing his testimony in

English, and needed the help of a Spanish interpreter. A review of the transcript quite clearly indicates that the jury was not left with the impression that the defense team bribed the witness, but instead that Romon was simply nervous. Consequently, we see no basis for determining that there exists inherent or structural prejudice.

Furthermore, Trivigno has not argued that his attorney lacked a reasonable basis for objecting, and he cannot establish that these isolated comments prejudiced him in any way. As set forth above, the evidence against him was overwhelming and there is no reasonable doubt that the interaction between Romon and the assistant district attorney had no effect on the outcome of this matter. Accordingly, Trivigno has not shown that he is entitled to a new trial because his lawyer was ineffective.

### 3. Trial Court's "Kloiber" Instruction:

Trivigno's last assertion that counsel erred is that he failed to object to one of the judge's instructions regarding witness identification testimony. Trivigno posits that the trial court improperly instructed the jury about the import of identification testimony of Rivera and Cheryl Varano. We reject this claim. The trial court instructed the jury in accordance with the Pennsylvania Suggested Standard Jury Instructions (Crim) § 4.07. In relevant part, the court charged the members of the jury to view the identification testimony with caution if they found that the witness had an obstructed view, or if they found inconsistencies in the testimony of the witnesses; but, if they did not so find, they could treat the identification as a "statement of fact." This instruction is based on Commonwealth v. Kloiber, 378 Pa. 412, 106 A.2d 820, cert. denied, 348 U.S. 875, 75 S.Ct. 112, 99 L.Ed. 688 (1954), and we specifically approved of it in Commonwealth. v. Henderson, 497 Pa. 23, 438 A.2d 951, 958 (1981). Thus, even if we now determine that the instruction was improper, which we decline to do, the charge was appropriate at the time and

counsel had a reasonable basis not to object to it. *See, e.g., Commonwealth v. Porter,* 556 Pa. 301, 728 A.2d 890, 900 (1999) (trial counsel is not ineffective for failing to anticipate change in the law.). Trivigno cannot establish that his counsel was ineffective and he is not entitled to a new trial.

### D. *Future Dangerousness*

Trivigno's final claims of reversible error focus on the penalty phase and whether the prosecutor, in his closing, argued that Trivigno posed a future danger to society. For the reasons that follow, we vacate the sentence of death and remand for a new penalty hearing.

At the penalty hearing, the defense presented a number of witnesses, including Trivigno and some members of his family. Each counsel presented closing arguments. During the prosecutor's closing he discussed Trivigno's past crimes, specifically telling the jury that Trivigno's criminal trespass convictions and misdemeanor assaults pointed to the future. The prosecutor said:

> Well, then you will decide whether or not this history is significant or not, *whether or not these prior criminal convictions are a weather vane looking into the future,* whether or not they are significant in that *they are a determinant of where the man is, where's he's going, not just where he's been,* breaking in, assault and now this.

(N.T., 10/1/96 at 45, emphasis added.)

Trivigno asserts that these excerpts show that the assistant district attorney did argue his future dangerousness. He further contends that it was per se error for the Commonwealth to do so, and then argues that the trial court should have given a jury instruction in accordance with *Simmons v. South Carolina,* 512 U.S. 154, 162, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994). Citing *Commonwealth v. May,* 551 Pa. 286, 710 A.2d 44 (1998), *cert. denied,* 525 U.S. 1078, 119 S.Ct. 818, 142 L.Ed.2d 676 (1999), the Commonwealth insists that the com-

ments of the prosecutor were merely addressing Trivigno's past conduct and not his future dangerousness. We must disagree.

In this case, unlike in *May, supra*, the prosecutor did not confine his argument to Trivigno's past conduct.[6] Rather, he specifically asked the jury to use the convictions as a "weather vane" to the "future" and as a determinant to where he is "going." The Commonwealth was not using past convictions to support the aggravating circumstance of past felony convictions pursuant to the statute[7] as in *May* or in *Commonwealth v. Williams*, 557 Pa. 207, 732 A.2d 1167 (1999) or *Commonwealth v. Rompilla*, 554 Pa. 378, 721 A.2d 786, 795 (1998). Indeed, the Commonwealth offered evidence of one aggravating circumstance: that defendant created a grave risk of death to another person other than the victim.[8] Under the circumstances presented, we believe that the arguments of the Commonwealth reasonably infer that the jury was being asked to consider the future dangerousness of Trivigno as an aggravating factor. This is supported by the fact that during deliberations the jury posed two questions:

Could you please define exactly what life without parole means? Is it in prison forever or is there still a chance for parole?

6. In addition, in *May*, the trial court agreed to give an instruction explaining that life imprisonment meant that the defendant was not eligible for parole, but also indicated that the charge would include the possibility of a commutation by the Governor. 710 A.2d at 46.

7. While Appellant had been convicted of criminal trespass, and three misdemeanors of simple assault, recklessly endangering another and possession of an instrument of crime, he had not been convicted of two felony convictions and did not meet the requirements of *Commonwealth v. Basemore*, 525 Pa. 512, 582 A.2d 861, 870 (1990). Thus, the prosecution could not present the aggravating circumstance of a significant history of felony convictions.

8. At the penalty phase, Trivigno introduced evidence of four mitigating circumstances, one of which was that he had no significant history of prior criminal convictions. The others were that his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law were substantially impaired; his character and record; and the circumstances of the offense.

Are the other crimes the defendant was convicted of mean they are concurrent or are they separate sentences?

(N.T., 10/1/96 at 81.)

Although we agree that the assistant district attorney did argue future dangerousness, we reject the notion that it is per se error for the prosecutor so to argue. This assertion was rejected in *Simmons*, 512 U.S. at 162–63, 114 S.Ct. 2187. Once the jury determines that a certain defendant is eligible for the death penalty, it is free to consider a myriad of factors to decide whether the imposition of the death penalty is an appropriate punishment. *Id.*, at 163, 114 S.Ct. 2187. While it is not error for the prosecutor to argue a defendant's future dangerousness, in these circumstances the trial court should have given an instruction explaining what a "life sentence" in this Commonwealth means. *Commonwealth v. Chandler*, 554 Pa. 401, 721 A.2d 1040, 1046 (1998).[9]

In this case, specifically relying on *Commonwealth v. Henry*, 524 Pa. 135, 569 A.2d 929, 941 (1990), *cert. denied* 499 U.S. 931, 111 S.Ct. 1338, 113 L.Ed.2d 269 (1991) (N.T., 10/1/96 at 79), the trial court refused to inform the jury about what a life sentence means in Pennsylvania, and instead instructed the jury as follows:

That is not for your consideration. Your consideration as a jury in the penalty phase is simply to make a determination whether life imprisonment or death is the appropriate sentence.

(*Id.* at 81.) This was error. Given that the prosecution had placed Trivigno's future dangerousness at issue, the trial court should have at this point explained what a life sentence means in accordance with *Simmons*.[10] *Chandler*, 721 A.2d at 1045–

9. This author and Justice Castille dissented in *Chandler* on the basis that the district attorney's comment was a passing one and did not put the issue of the defendant's future dangerousness before the jury. In the present case, unlike *Chandler*, the prosecutor specifically asked the jury to use past conduct as a predictor for the "future." In addition, this case more closely resembles the situation presented in Simmons because the jury specifically asked for an explanation of what a life sentence meant. *Compare Simmons*, 512 U.S. at 160, 114 S.Ct. 2187.

10. It should be noted that a minority of this Court has expressed the view that in all capital cases, trial judges in Pennsylvania should

46.[11]

We acknowledge that before this time there has been some uncertainty as to the exact instruction that a trial court should give in these circumstances; however, the law is clear that the court should have at least explained that life imprisonment means that the defendant is not eligible for parole. *Commonwealth v. Christy*, 540 Pa. 192, 656 A.2d 877, 888–89, *cert. denied*, 516 U.S. 872, 116 S.Ct. 194, 133 L.Ed.2d 130 (1995). In addition, a majority of this court has previously suggested that an appropriate instruction would include a discussion of the possibility that a defendant's life sentence might be commuted. See *Commonwealth v. Robinson*, 554 Pa. 293, 721 A.2d 344 (1998), *cert. denied*, —— U.S. ——, 120 S.Ct. 804, 145 L.Ed.2d 677 (2000) where Justice Zappala, joined by Justice Nigro, indicated in a footnote in his concurring opinion that a standardized Simmons instruction should:

advise the jury that a person subject to a term of life imprisonment is not eligible for parole; *the Governor has the power to grant commutation of sentence or pardon upon unanimous recommendation of the Board of Pardons* following a public hearing; and the Board of Pardons is composed of the Lieutenant Governor, the Attorney General, and three Pennsylvania residents appointed by the Governor, including a crime victim, a corrections expert, and a medical doctor, psychiatrist or psychologist.

721 A.2d at 356 (emphasis added). Also in *Robinson*, Chief Justice Flaherty in his Dissenting Opinion and this author in

instruct capital sentencing juries that life imprisonment means life without parole, even where the Commonwealth has not made future dangerousness an issue. *See, e.g., Commonwealth v. Robinson*, 554 Pa. 293, 721 A.2d 344 (1998)(Zappala J. Concurring Opinion)(Nigro J. Concurring Opinion)(Flaherty, Chief J., Dissenting Opinion).

**11.** In *Chandler*, the prosecution argued in the penalty hearing that:

Frankly, ladies and gentlemen, life imprisonment in this case is simply not enough. I am asking you, with your verdict today, to stop (the defendant) to stop him from ever hurting another woman again, to stop him from ever killing another woman again.

*Id.*, 721 A.2d at 1046. A majority of this court determined that this language was urging the jury to consider the potential future dangerousness in its imposition of a penalty, and thus the trial court erred in rejecting a request for a *Simmons* instruction. *Id.*

her Concurring Opinion agreed that the court should inform the jury of the "impossibility of parole and the possibility of commutation." *Id.* See also *Commonwealth v. Clark, supra,* where we approved of the following instruction:

> All right. I'm going to give you as complete a statement as possible, a truthful situation as to what life imprisonment means in Pennsylvania. Life imprisonment, generally speaking, whether imposed by a jury, does not cover any possibility or does not include any possibility of parole. That's the general proposition. That means life without parole.

> *But there are two things I want to mention to you in that regard. First, the Parole Board at any time can recommend to the Governor to commute the life sentence. That means commutation of sentence. And if the Governor grants the commutation of sentence,* then the Parole Board may grant parole. So there can be a parole under those circumstances.

> What percentage of life imprisonment sentences result in commutation of sentence and parole, I can't give you. I don't have accurate statistics which I can take judicial notice on. That possibility exists.

> Now, the second thing I want to say with regard to this: I'm giving you the law as it exists this afternoon. What the law will be tomorrow and next week and what it will be next month no one can predict. The State legislature can redefine any of those things at any time, so keep those two factors in mind.

*Id.,* 710 A.2d at 35 (emphasis added).

We now hold that when a *Simmons* instruction is required because the prosecution has argued the defendant's future dangerousness, the trial court, like the court in *Clark,* should inform the jury that a life sentence means that a defendant is not eligible for parole, but that the Governor has the power to grant a commutation of a sentence of life or death if based on the recommendation of the Board of Pardons following a public hearing. Further, the trial court should

relay any available statistical information relating to the percentage of life sentences that have been commuted within the last several years. *E.g. Commonwealth v. Martin,* 554 Pa. 331, 721 A.2d 763 (1998); [12] Accordingly, we vacate the sentence of death and remand for a new sentencing hearing.

Justice SAYLOR files a Concurring Opinion in which Justices ZAPPALA and CAPPY join.

Justice CASTILLE files a Concurring and Dissenting Opinion.

SAYLOR, Justice, concurring.

Although I concur with the majority's disposition, I respectfully differ with the analysis concerning the propriety of arguing Appellant's future dangerousness to the jury during the penalty phase. The majority concludes, based upon a passage from the United States Supreme Court decision in *Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), that once a jury determines that a defendant is eligible for the death penalty, it is free to consider a myriad of factors, including future dangerousness, in deciding whether the imposition of the death penalty is appropriate.

The Court in *Simmons,* however, was elaborating on the constitutional limitations placed upon the capital sentencing process and, in particular, those resulting from the Eighth Amendment. These limitations require the courts to view the capital sentencing scheme as entailing two separate and distinct decisions, namely, eligibility and selection. *See Tuilaepa*

12. In *Martin,* Chief Justice Flaherty (joined by Justice Nigro), in a concurring opinion, wrote that the trial court:

could be equipped with statistical information relating to the percentage of life sentences which had been commuted within the last several years. Not only would the jury be aided by knowing those percentages during the penalty deliberations, but the defendant should be entitled to have the jury aware of what statistical possibility exists that a life sentence imposed on him would result in commutation. Moreover, I can see no prejudice that the Commonwealth would suffer if every defendant facing a sentence of death received a *Simmons* jury instruction explaining, as thoroughly as possible, what 'life imprisonment' means in Pennsylvania.

721 A.2d at 785.

*v. California*, 512 U.S. 967, 971, 114 S.Ct. 2630, 2634, 129 L.Ed.2d 750 (1994). In the eligibility determination, the statutory scheme must narrow the class of persons for whom the death penalty applies and justify the imposition of such penalty as compared to others found guilty of murder. *See Lowenfield v. Phelps*, 484 U.S. 231, 244, 108 S.Ct. 546, 554, 98 L.Ed.2d 568 (1988). One means of narrowing the class is by prescribing aggravating circumstances that must exist before the death penalty can be imposed, which serves to appropriately channel the sentencer's discretion. *See Blystone v. Pennsylvania*, 494 U.S. 299, 306–07, 110 S.Ct. 1078, 1083, 108 L.Ed.2d 255 (1990). The selection decision is implicated when the sentencer decides whether a defendant who is eligible for the death penalty should in fact receive that sentence. *See Tuilaepa*, 512 U.S. at 972, 114 S.Ct. at 2635. It is in this respect that the passage from *Simmons* has relevance—as the Eighth Amendment does not impose a constitutional limitation upon the discretion of the sentencing authority in the selection stage, a variety of factors may be considered. *See id.* at 979–80, 114 S.Ct. at 2639.

Nevertheless, the admission of evidence in the penalty phase of a capital case is governed, in the first instance, by the applicable state statute. The South Carolina death penalty statute at issue in *Simmons* required the jury to first decide eligibility by reference to whether one or more statutorily prescribed aggravating circumstances existed. Where an aggravator was present (and thus eligibility established), the jury made the selection determination, in the course of which it was expressly permitted to consider "additional evidence in extenuation, mitigation, or aggravation of the punishment." *See* S.C.Code Ann. § 16–3–20(B). Thus, as the Court in *Simmons* explained, South Carolina's "evidence in aggravation is not limited to statutory aggravating circumstances." *Simmons*, 512 U.S. at 162, 114 S.Ct. at 2193.

In Pennsylvania, by contrast, the legislature has not elected to generally expand the range of aggravating factors relevant to selection over and above the aggravating criteria considered

in determining eligibility.[1] Under the Pennsylvania sentencing scheme (as in South Carolina), the jury first determines eligibility by deciding if one or more of a specific range of aggravating circumstances has been satisfactorily established. *See* 42 Pa.C.S. § 9711(c); *Blystone*, 494 U.S. at 306–07, 110 S.Ct. at 1083. However, unlike South Carolina's scheme, a Pennsylvania jury then makes the selection decision by balancing precisely the same statutorily prescribed aggravators against any mitigating circumstances which they may find to exist. *See* 42 Pa.C.S. § 9711(c).[2] Since the constitutionally required narrowing (eligibility) process and the subsequent selection process are confined to the same criteria (on the aggravating side of the equation), there is no basis for consideration of non-statutory aggravators such as a defendant's future dangerousness.

Indeed, this Court has expressly held that, under our present statutory scheme, evidence must relate to a specific aggravating or mitigating circumstance. *See Fisher*, 545 Pa. at 266, 681 A.2d at 146. Moreover, the Court has stated, albeit in dicta, that because future dangerousness is not an aggravating circumstance under Pennsylvania's death penalty statute, it is not a valid factor to be considered by the jury. *See Commonwealth v. Marrero*, 546 Pa. 596, 610 n. 19, 687 A.2d 1102, 1108–09 n. 19 (1996).

In my view, therefore, the interjection of future dangerousness into our capital sentencing scheme, without statutory

1. The death penalty statute has recently been amended to provide that evidence concerning the victim and the impact the death had upon the victim's family may also be presented during the sentencing hearing, even though such evidence is not among the statutory aggravating circumstances listed in Section 9711(d). *See* 42 Pa.C.S. § 9711(a)(2). The constitutionality of this provision is presently pending before this Court in *Commonwealth v. Means*, 54 E.D. Appeal Dkt.1997.

2. Although Section 9711(a) of the Sentencing Code, 42 Pa.C.S. § 9711(a)(2), states that "evidence may be presented as to any other matter that the court deems relevant and admissible on the question of the sentence to be imposed," this language was intended to allow the Commonwealth the latitude to respond to mitigating evidence introduced by the defendant under the "catchall" provision in Section 9711(e)(8). *See Commonwealth v. Fisher*, 545 Pa. 233, 268, 681 A.2d 130, 147 (1996).

authorization or without the matter having been placed in issue by the defense, constitutes error.

Justices ZAPPALA and CAPPY join this concurring opinion.

CASTILLE, Justice, concurring and dissenting.

While I agree that appellant's claims of error regarding the guilt phase of this capital case do not entitle him to relief, I must respectfully dissent from the Court's decision to vacate appellant's death sentence and remand the matter for a new sentencing hearing. In my view, no *Simmons* instruction was requested, or even warranted in this case. Furthermore, even if such an instruction were warranted, I cannot agree that trial judges should be required to provide juries with statistics regarding the percentage of life sentences which have been commuted within the last several years.

When the issue of future dangerousness is expressly implicated and the defendant specifically requests a *Simmons* instruction, due process requires that the sentencing jury be instructed on what the term "life sentence" means in Pennsylvania. *Commonwealth v. Chandler*, 554 Pa. 401, 415, 721 A.2d 1040, 1046 (1998); *see also Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994). Quoting a single sentence from the prosecutor's summation, the majority finds that the prosecutor argued appellant's future dangerousness. Specifically, the majority concludes that the prosecutor's remarks in effect asked the jury to consider appellant's future dangerousness as an "aggravating factor." After finding that the prosecutor's argument was not per se error, the majority concludes that the trial judge erred in "refusing" to issue a *Simmons* instruction. Based upon my careful review of the record, I can find no such error.

Although appellant did not have two prior felony convictions, thus precluding the Commonwealth from pursuing as an aggravating circumstance a significant history of felony convictions involving the use or threat of violence to the person, *see* 42 Pa.C.S. § 9711(d)(9), he did have prior convictions.

Notwithstanding this record, which was introduced by stipulation at the penalty phase, appellant proffered as a mitigating circumstance that he had no significant history of prior criminal convictions. *See* 42 Pa.C.S. § 9711(e)(1).

When the disputed comments in the penalty phase are properly viewed in context, it is apparent that the prosecutor, far from arguing future dangerousness as an *aggravating* factor, plainly was addressing only the question of whether the jury should find the mitigating circumstance of no significant history of prior criminal convictions. The prosecutor began his discussion of the aggravating and mitigating circumstances by discussing the one aggravating circumstance he had alleged, *i.e.*, that appellant knowingly created a grave risk of death to another person other than the victim. *See* 42 Pa.C.S. § 9711(d)(7). After arguing the basis for finding that circumstance, the prosecutor noted that the jury would have to "weigh that to see whether or not it outweighs these mitigating factors," the first of which was the alleged absence of a significant history of prior criminal convictions. N.T. 10/1/96 at 42–43. The prosecutor argued that it was for the jury to decide what could be deemed "significant," and then discussed appellant's prior convictions for criminal trespass and simple assault. Appellant registered his *only* objection to the closing at this point, essentially complaining that the prior record stipulation had identified appellant's prior crimes only by name, while the prosecutor was attempting to argue the specific facts, which had not been presented to the jury. After a short sidebar discussion, the prosecutor agreed not to argue the specifics of the prior convictions. N.T. 10/1/96 at 43–45.

The prosecutor then made the remark that the majority finds was an invitation to the jury to consider appellant's future dangerousness as an aggravating factor. But, viewed in context, the remark was not a comment on future dangerousness. The prosecutor was still addressing whether or not appellant's stipulated history of prior criminal convictions was "significant" or not. The prosecutor emphasized that this was a matter for the jury to decide, then suggested that the jury could conclude that they comprised a "significant history"

because the convictions were a "weather vane looking into the future"—the future, in this context, being where appellant was *now, i.e.,* "breaking in, assault and now this." N.T. 10/1/96 at 45. The remark was not at all a comment on future dangerousness, *i.e.,* it was not a request for the jury to return a verdict of death to prevent appellant from hurting someone else. *Compare Commonwealth v. Chandler, supra,* 721 A.2d at 1046 (prosecutor's asking jury to use its penalty verdict to "stop [defendant] from ever hurting another woman again, to stop him from ever killing another woman again" injected issue of future dangerousness) *with Commonwealth v. King,* 554 Pa. 331, 721 A.2d 763, 779 (1998) (no comment on future dangerousness where prosecutor never argued or suggested that death penalty should be imposed because defendant could otherwise potentially hurt someone else).

Notably, appellant did not object to the remark that concerns the majority. Instead, the trial court *sua sponte* called for a sidebar and admonished the prosecutor not to argue what constituted a "significant" history for purposes of the proffered mitigator. N.T. 10/1/96 at 45–46. At the sidebar, appellant argued that the prosecutor should not be able to argue that he had a significant history of prior convictions because the Commonwealth had not alleged, as an aggravating circumstance, that he had a significant history of violent felony convictions. This was a rather dubious proposition since the multiple violent felony aggravating circumstance and the insignificant criminal history mitigating circumstance are decidedly different matters. Appellant also asserted that the Commonwealth's argument that he had a significant history of criminal convictions, after it had not pursued the aggravating circumstance, was the equivalent of arguing future dangerousness. N.T. 10/1/96 at 45–47. This was another rather dubious proposition in light of our holding in *Commonwealth v. May,* 551 Pa. 286, 710 A.2d 44 (1998).[1] Significantly, appellant did

---

1. In *May,* this Court held that the Commonwealth's pursuit of the multiple violent felony aggravating circumstances did not implicate future dangerousness, because "[t]he aggravating circumstances of appellant's prior record for violent felonies addressed only appellant's past conduct, not his future dangerousness." *May,* 551 Pa. at 291, 710

*not* argue that the "weather vane," "looking into the future," and "where he's going" language suggested future dangerousness. Rather, the objection appeared to be that *any* comment disputing the applicability of the mitigating circumstance amounted to a future dangerousness argument.

After the trial court ruled that it would not allow the prosecutor to continue arguing that appellant had a significant history of convictions, appellant requested a cautionary charge. He did not request a *Simmons* instruction, *i.e.*, he never asked the court to instruct the jury that a life sentence in Pennsylvania means life without the possibility of parole. Indeed, he did not articulate what kind of instruction he thought was necessary. N.T. 10/1/96 at 47–48.

The court then issued a cautionary instruction, telling the jurors that their recollection of the testimony controlled on the issue of appellant's prior convictions and their judgment determined its importance to their decision as to the penalty. Although the cautionary instruction did not contain a *Simmons* charge, appellant made no objection.[2] N.T. 10/1/96 at 48–49. In addition, appellant never requested a *Simmons* instruction before the court charged the jury in the penalty phase, nor did he object to the absence of a *Simmons* charge prior to the jury's deliberation.

The "refusal" to charge referred to by the majority arose only when the jury *returned from deliberations* with a question. Specifically, the jury asked: "Could you please define exactly what life without parole means? Is it in prison forever

A.2d at 47. Similarly, a discussion of he applicability of the insignificant criminal history mitigating circumstance focuses on past conduct and does not implicate future dangerousness.

**2.** Although appellant made no further objection, the trial court interrupted the prosecutor again and *sua sponte* issued a further cautionary charge that, in effect, ordered the jury to find the presence of the insignificant criminal history mitigating circumstance, instructing the jury that: "[s]ignificant history means that you have two or more violent crimes prior to the incident, and that is what significant history means." N.T. 10/1/96 at 49. This instruction, which assumes that the violent felony aggravating circumstance mirrored the insignificant criminal history mitigating circumstance, was clearly erroneous and benefited appellant.

or is there still a chance for parole?" N.T. 10/1/96 at 81. Only at that point did appellant ask that the jury be informed that a life sentence includes no possibility of parole. Notably, appellant did *not* assert that the jury should be informed that a life sentence includes no possibility of parole because the Commonwealth had argued future dangerousness and, thus, the two-year-old *Simmons* case required it. Instead, he argued the distinct point that, because the jury's question was so "fact specific," it should be answered. N.T. 10/1/96 at 78.

In short, the prosecution did not argue future dangerousness and, even if it did, appellant never requested, nor was he "refused," a *Simmons* instruction. Appellant never argued to the trial court that the prosecutor argued future dangerousness and, therefore, he was entitled to a *Simmons* charge. The majority has vacated a valid sentence of death premised upon an argument unsupported in the record and never raised at the penalty hearing. Because I can discern no error in the trial court's rulings at the penalty phase, I would affirm the sentence of death.

Perhaps more troubling to me than the majority's *Simmons* analysis is its directive that, in cases where a *Simmons* charge is appropriate, the trial court should not only inform the jury of the defendant's ineligibility for parole and the prospect of commutation, but also "should relay any available statistical information relating to the percentage of life sentences that have been commuted within the last several years." Quoting with approval the concurring opinion by Chief Justice Flaherty in *Commonwealth v. Martin*, 554 Pa. 331, 721 A.2d 763, 785 (1998), the majority states that, "the defendant should be entitled to have the jury aware of what statistical possibility exists that a life sentence imposed on him would result in commutation." I believe that the Court significantly errs by requiring consideration of statistics concerning recent commutations. Once we start down that path, the next logical step is to examine what happened to those whose life sentences were commuted. Thus, the Commonwealth should be able to request that the jury be informed about Reginald McFadden, a convicted murderer and model prisoner who, upon commuta-

tion and release, went on to kill again, or any other horror story involving a commuted killer. The defense would then counter with the number of commuted killers who, at least to date, had proven to be productive members of society. None of this extraneous information, it seems to me, is an appropriate consideration for a capital jury. The pertinent information is that, in Pennsylvania today, life means life without the prospect of parole, but the possibility of commutation exists.

Furthermore, the majority's requirement of evidence of recent commutation statistics immediately calls to mind Mark Twain's aphorism, which he attributed to Benjamin Disraeli, that "there are three kinds of lies: lies, damned lies and statistics." Mark Twain, Autobiography of Mark Twain 286 (Charles Neider ed., Harper Perennial 1990). What puts Twain's "lie" to the statistics required by the majority is that evidence of the percentage of recent commutations has little relevance in determining the "statistical possibility" of commutation for any particular life-sentenced defendant. Commutation decisions are necessarily fact-driven. The fact that a certain percentage of other defendants, from widely differing backgrounds, charged with a wide variety of offenses, have, or have not, had their sentences commuted says little about the prospects for any other defendant. Furthermore, past commutation percentages are hardly the only, or even the most important, predictor of future commutation prospects. No commutation scheme, or history, is impervious to change. Times change, state legislatures change, and governors change. It is impossible to forecast in any way approaching reliability the commutation prospects of a life-sentenced prisoner fifty years from now, or forty years from now, or even next year. At a minimum, under the majority's scheme, the jury should also have to be informed of this political reality.[3]

3.  In this regard, I note that the governor of Illinois recently announced a moratorium on the death penalty in that state, pending the report of a committee appointed to investigate the flaws in Illinois's capital punishment system. Under the majority's full disclosure scheme, this prospect should also be disclosed to the jury, as should the prospect that a death sentence may be overturned on further review by this Court or the federal courts.

In my view, the majority's holding opens a veritable Pandora's Box, inviting consideration of irrelevant and unreliable information that would cloud, rather than clarify, the very serious decision the jury must make in the penalty phase. It would be a misguided legislative scheme, and is even worse jurisprudence. Hence, I dissent.